BEVERLY RUBBER CO., (GOODYEAR v.) See Case No. 5,557.

---

## Case No. 1,379.
### BEVIN v. EAST HAMPTON BELL CO.
[9 Blatchf. 50; 5 Fish. Pat. Cas. 23.][1]

Circuit Court, D. Connecticut. Sept. 19, 1871.

PATENTS FOR INVENTIONS—ABANDONMENT—WHAT CONSTITUTES—SUCCESSIVE APPLICATIONS — CONTINUITY—QUESTION OF FACT — WITHDRAWAL OF APPLICATION.

1. Where the undisputed acts of an inventor furnish evidence of the abandonment of his in-

---

[1] [Reported by William Searcy Flippin, Esq., and here reprinted by permission.]

[1] [Reported by Hon. Samuel Blatchford, District Judge, and by Samuel S. Fisher, Esq., and here compiled and reprinted by permission. Syllabus is from 5 Fish. Pat. Cas. 23; opinion from 9 Blatchf. 50.]

vention, his testimony upon the trial that he never did intend to abandon it is entitled to very little consideration.

2. In applying the language of courts, attention must be paid to the facts with which they are dealing. This is especially true when citing their opinions in patent causes.

3. An application can disclose nothing to the public, nor give the public notice of any definite intention of the inventor, while that application, and the most important papers in which the invention is described, are not in the patent office, but are in the inventor's possession.

4. Where an inventor, after the rejection of his application, did nothing to amend or reverse the judgment of the patent office for ten years: *Held*, that this delay could not be excused by the plea that, as the rejection was wrongfully made, the delay was the fault of the commissioner, and not of the inventor.

[Distinguished in Colgate v. W. U. Tel. Co., Case No. 2,995.]

5. Where an inventor filed his application in 1852, which was acted on without delay, and rejected for a simple and intelligible reason, but instead of taking any steps to reverse the action of the office, the applicant withdrew all his papers, including the application itself, except a single drawing, and then, for ten years, permitted his invention to go into notorious public use; *Held*, that the application was abandoned.

[Cited in Manning v. Cape Ann Isinglass & Glue Co., Case No. 9,041; Perkins v. Nashua Card & Glazed Paper Co., 2 Fed. 453.]

6. In January, 1852, B. applied for a patent. His application was rejected in April, 1852. He did not appeal or apply for a re-examination. In May, 1852, he took from the patent office his application, and all the papers connected with it, except one drawing, but made no formal withdrawal. The papers so withdrawn were never returned. From May, 1852, until April, 1862, he had no communication with the patent office, and took no steps towards obtaining a patent. During that interval, his invention went into extensive use, with his knowledge, and without his objection. In April, 1862, he filed a new application for a patent for the invention, and paid a new fee. The new application made no reference to the application of 1852. The fee paid to the patent office in 1852 was not withdrawn: *Held*, that the application of 1852 had been abandoned, and that a patent granted in 1869, on the application of 1862, was void, because of the public use of the invention, for nearly ten years before 1862, with the permission of the inventor.

[Cited in Colgate v. W. U. Tel. Co., Case No. 2,995; Manning v. Cape Ann Isinglass & Glue Co., Id. 9,041; Perkins v. Nashau Card & Glazed Paper Co., 2 Fed. 453.]

7. The continuity of two successive applications for a patent for the same invention is a question of fact, and not of law, and is to be determined by evidence.

[Cited in Weston v. White, Case No. 17,459; Colgate v. W. U. Tel. Co., Id. 2,995; Kittle v. Hall, 29 Fed. 514.]

8. A technical withdrawal of the first application is not necessary to interrupt the continuity between it and a succeeding one. It may be in fact, though not in form, withdrawn.

[Cited in Weston v. White, Case No. 17,459; Kittle v. Hall, 29 Fed. 514.]

[In equity. Bill by Abner G. Bevin against the East Hampton Bell Company for infringement of letters patent. Bill dismissed.]

W. Edgar Simonds, for plaintiff.

John S. Beach, for defendants.

Before WOODRUFF, Circuit Judge, and SHIPMAN, District Judge.

SHIPMAN, District Judge. This is a bill in equity, praying for an injunction and an account, and is founded upon a patent issued to the plaintiff, May 4th, 1869. The alleged invention is called, in the patent, an "improvement in metallurgic furnaces." The device is a simple one and need not be described here. It is sufficient to say, that it required inventive thought to originate it, and that it is a useful improvement. That the plaintiff was the original and first inventor may, also, be conceded. The defense, as set up in the defendant's answer, rests upon the following grounds: (1.) That the invention "was in public use, with the knowledge and consent of the inventor, for more than two years prior to his application for the said letters patent." (2.) "That the plaintiff, since his application for said letters patent, and before the issuing of the same, and during the period of seven years which elapsed between said application and the obtaining of said letters patent, knowingly permitted his alleged invention to become public property, and abandoned the same to the public."

There is very little dispute between the parties about the facts. In January, 1852, the plaintiff applied for a patent, and, in April of the same year, his application was rejected. From this rejection no appeal was taken, or re-examination applied for. In May next following, the plaintiff took his application, and all the papers connected with it, except one drawing, from the patent office, but no formal withdrawal appears to have been made. The papers thus withdrawn from the office were never returned. From May 28th, 1852, till April 28th, 1862, the plaintiff had no communication with the patent office, and the only evidence which that office contained, during these ten years, of his alleged invention, was the drawing, and the entries on the file wrapper of the date of filing the petition and other papers, the rejection of the application, and the delivery of the papers, on the order of the plaintiff, to his brother, May 28th, 1852.

At the time his application was rejected, in April, 1852, the office referred the plaintiff to "Wyman on Ventilation," as containing evidence that his invention had been anticipated and antedated. The plaintiff, in his testimony, states what he subsequently did in reference to securing a patent under this application, as follows: "I consulted Mr. Barnes," (his attorney through whom he had made his application.) "Mr. Barnes said to me, that I had paid in thirty dollars in gold, that I could, if I wished to abandon it, draw back twenty dollars from the government, but his advice was to let it lie and think of it, and, perhaps, I might think it best to take it up some other time, and I might see some others, perhaps some one in Washington, who would be able to go and explain

the matter, and see more particularly about the reasons; and, in the course of two or three years, or a year or two, my brother saw Mr. Truman Smith, a member of congress. Mr. Smith said he would undertake to obtain the rejected patent, but he thought I had better make some little alterations, and, in looking at the thing, I did not see how I could, and never did make any alterations, and so it run along till 1862, I think it was, when I became acquainted with Munn & Co., of New York, who said they would undertake to obtain it for me and made application." "The patent was rejected," (the application of 1852,) "because it was supposed to be anticipated by 'Wyman on Ventilation.' Mr. Barnes said that he had never seen the book, and could not find it in Middletown, and thought that perhaps I might find it in Hartford or New Haven. I could not find it in Hartford, and I went to New Haven, probably in the course of a year or two after the rejection. I consulted Professor Olmsted, of Yale College. He said, (after looking at the book,) that he did not think it ought to have been rejected on that account." No other or further steps were taken by the plaintiff, or any one on his behalf, towards obtaining a patent for this invention, till April, 1862.

In the mean time, the plaintiff, who resided in the village of East Hampton, Connecticut, where most of the sleigh bells used in this country were, and still are, made, erected, in 1852, a furnace embodying his invention. The same year Buell & Veazy erected one, and, in 1853, another. In 1853, one was built by J. S. Hall & Co. In 1856, the defendants built theirs. In 1856, 1857 and 1860, three others were erected. All these furnaces embraced the alleged invention of the plaintiff, were situated in the village where he constantly resided, and have been openly in use down to the present time, in the same business as that in which the plaintiff has been engaged. The fact that these furnaces were all erected upon the same plan as that described in the plaintiff's patent, and used for the same purpose, was known to him from the time each was built, down to the date of his patent, in 1869. During all this time, the plaintiff made no objection to this open and continued use of his invention by his neighbors and competitors in business, with all of whom he appears to have been on friendly terms. It is true, he gave them no express permission. The only references ever made to the subject, so far as the evidence discloses, are those testified to by the plaintiff. He says: "I don't know that I ever objected. Mr. Abell, (of the East Hampton Bell Co.,) came to me, when they were about to build theirs, and asked me if he could see our furnace and chimney. I told him he could, but I could give him no license to build one like it, for I had applied for a patent and might some time obtain it. About the same time, J. G. Hinckley" (who had constructed the plaintiff's) "was about to build one for

J. S. Hall & Co., and he came to see me and said he had heard something about my applying for a patent. I told him I had. and could give him no license to build one." Hinckley also testifies, that he built many of the chimneys already referred to, and that he had conversations with the plaintiff about them on various occasions, but that he never asked his permission to build any of them. This embraces the whole history of this invention and the dealings of the plaintiff and others with it down to April, 1862, when he filed another application for a patent.

In April, 1862, the plaintiff filed the new application, paying the fee of fifteen dollars, as prescribed by the act of 1861, [12 Stat. 248, § 10,] then in force, that act requiring that sum to be paid on filing an original application. In this new application, no reference was made to that of 1852, nor to the payment of the fee required by the former act, nor to any circumstance connected with it. Indeed, the fact that any prior application had been made, seems to have been studiously ignored. This application of 1862 was filed April 28th, and rejected May 10th in the same year. The specification and one drawing which had been used on that application appear to have been taken from the office, and were returned by the plaintiff's agents, Munn & Co., March 17th, 1863. No further communication with the office was had by the plaintiff, or his agents, till April 5th, 1869, when a re-examination was applied for. In regard to the course of the plaintiff after the rejection of May, 1862, he testifies as follows: "After that I went to Washington myself, and saw Mr. Smith there then. He was not a member of congress at that time. He thought it would cost considerable, and I concluded that I would think of it, and see what the prospect was of its value, and I neglected to employ him, or any one else, to make further application, until 1868, I think it was," (it was, in fact, in March, 1869,) "when I employed Theodore G. Ellis, and he obtained the patent in controversy." During the period which elapsed between the rejection of the application in May, 1862, and the application for a re-examination in 1869, four or five other furnaces were erected in the same village, all embodying the plaintiff's invention. They were all built, and put into use, with the knowledge of the plaintiff, and continued in use, without objection on his part, till his patent was finally issued.

As to the means employed by the plaintiff to prevent his invention from being known and used between 1852 and 1869, he says: "The first five or six years after I built this chimney, I put up a notice on the door, 'No admittance without permission;' but, of course, all the workmen knew it, and I think it wore out after five or six years, and that was the only measure I took to keep people from coming into the shop and looking around."

The plaintiff never withdrew the twenty

dollars paid to the patent office at the time of his first application. He also testified that he never intended to withdraw that application or abandon his invention. There is some evidence, also, that, during the erection and use of the chimneys referred to, they were sometimes spoken of as "Bevin's chimneys."

We have thus given, in detail, the whole evidence which the plaintiff has offered to meet the issues of more than two years' use before the application of 1862, and of abandonment of the invention after that and before the patent issued.

There is no evidence that we deem satisfactory, which would warrant us in concluding that these defendants knew or supposed that the plaintiff claimed this form of furnace as his exclusive property, or that he intended to secure a patent therefor, until near the time when the patent was granted. Even after this suit was commenced, and down to the time of filing the answer, they were ignorant of the application of 1852, as well they might be, for the application of 1862 purports, on its face, to be an original and independent one, and there was nothing in the proceedings of the patent office or the plaintiff, in connection with that application, which hinted at a prior one. The drawing to which the new specification referred was not the old one, but a new and different one; and, in the oath of the plaintiff, made on the 26th of March, 1869, and filed in support of the re-examination then asked for, he refers to his invention as one "for which he made application for letters patent of the United States, on or about the 28th day of April, 1862, and which was once rejected, May 10th, 1862." In the application on his behalf, by his attorneys, for a re-examination, dated April 5th, 1869, they refer to his rejected application, and state: "The first rejection was dated May 10th, 1862." Indeed, so completely was the application of 1852 ignored, in all those proceedings, that it would be difficult for us to repress the suspicion that concealment of that fact was intended, if there existed any adequate motive for such a course.

The first question which obviously arises on these facts is, whether the plaintiff must be deemed to have abandoned his application of 1852. His testimony on the trial, that he never did intend to abandon it, is entitled to very little consideration, in view of his acts. His undisputed acts were, certainly, very cogent evidence of abandonment. He withdrew his application, and all the papers connected with it, from the office, May 28th, 1852, and never, from that day to this, furnished the office with any evidence whatever that he intended to pursue that application. It is true, that he made no technical withdrawal; but he took away all the papers except one drawing, and never returned them, or made any allusion to them, in his subsequent transactions with the office. The only evidence of his intentions, or invention, which the patent office contained, for ten years, was a single drawing, which had been filed in support of an application soon rejected, and which had been left behind when all the other papers were withdrawn. In the mean time, his invention went into open and notorious use, in his own neighborhood and under his own eyes, and so continued for ten years, without one word of precaution or remonstrance on his part, either communicated to the public directly, or through the patent office constructively. His remark to one or two persons, in casual conversations, that he had applied for a patent and might some day obtain one, and, therefore, could give no license to use his invention, is of little importance, in view of the other facts in the case. No one asked his permission or license. He forbid no one the use of his alleged invention. His notice, on the door of his factory, that no one could enter without permission, is of still less consequence, as evidence of his intention to pursue a claim for a patent. Such notices are common on the doors of manufactories. They are as often put up to keep out idlers, as to conceal unpatented inventions. Besides, this notice was effaced by time long before he renewed his application, and, if its presence on his door, while it lasted, was evidence of his intention to obtain a patent for something within, its subsequent absence, for years, was evidence that he had abandoned that intention. But, while it was there it had no effect to conceal the invention, or notify the public against its use, for it was in daily and public operation throughout the village. During all this time, the plaintiff took no steps to secure a patent. He knew the ground on which the office rejected his application, and ascertained from Professor Olmsted that, in the opinion of the latter, the reason given by the office for the rejection was not sound. This was within a year or two after the rejection of May, 1852. Here the matter slept. No fact is given in the evidence, nor is any reason suggested, by which we can account for the plaintiff's long continued inaction, if he intended to pursue his claim. His device was a simple one. His application had been rejected for a simple reason. No considerable expense or trouble was required to endeavor to revise and reverse the decision of the office. The common plea of poverty is not set up. The plaintiff was, during all these ten years, prosecuting a successful business. This is clearly inferred from the fact that establishments of the same character as his were going into operation every year, and are still pursuing the same business. The plaintiff was misled by no suggestion of discouragement or difficulty in his path. The remark of Mr. Smith, that it would "cost considerable," was not made till after the rejection of 1862, and, if it had been, there is no pretence that the plaintiff was not able to defray the necessary cost of any legitimate effort to secure a patent. In

view of all the evidence on this point, it is impossible to resist the conclusion, that the plaintiff wholly abandoned his first application, gave up all idea of obtaining a patent under it, and, for that reason, permitted it to go into unmolested public use.

But, the plaintiff insists, that the fact that he filed an application in 1852, is conclusive evidence in his favor, and cites, in support of this claim, the case of Adams v. Jones, [Case No. 57.] In that case, Mr. Justice Grier remarked: "By the application filed in the patent office, the inventor makes a full disclosure of his invention, and gives public notice of his claim for a patent. It is conclusive evidence that the inventor does not intend to abandon it to the public. The delay afterwards interposed, either by the mistakes of the public officers, or the delays of courts, where gross laches cannot be imputed to the applicant, cannot affect his right." With this doctrine, in its application to the facts of that case, we have no controversy. Adams filed his application in 1850, but did not receive his patent till 1857. There is no suggestion that he took his papers, including his application, from the office, and never returned them, thus withdrawing from the public the disclosure he had made of his invention, and all evidence of its character, except a drawing, from which, alone, no one could tell precisely or substantially what he claimed. There does not appear to have been any voluntary delay on the part of the applicant. On the contrary, he not only did not withdraw his application, but "continued to insist upon his right to a patent." The delay in prosecuting his appeal to a hearing "was not in consequence of any laches of the complainant's, but of the inability of the aged chief justice to attend to the business of his office." In applying the language of courts, attention must be paid to the facts with which they were dealing. This is of especial importance when citing their opinions in patent causes. When it was said by the court, in the case above cited, that, by an application filed in the patent office, the inventor makes a full disclosure of his invention, and gives public notice of his claim for a patent, and that this is conclusive evidence that he does not intend to abandon it to the public, the court must be understood as referring to an application remaining on file, and prosecuted with at least some diligence, unless prevented by some cause other than that of the applicant's voluntary omission to move in the matter. An application for a patent can disclose nothing to the public, nor give the public notice of any definite intention of the inventor, while that application, and the most important papers in which the invention is described, are, not in the patent office, but in the inventor's pocket. The remarks of the court in that case, which immediately follow those already cited, show that the opinion will bear no such construc-

tion as that sought to be put upon it by the present plaintiff. "The statute," Mr. Justice Grier adds, "forfeits the right of an inventor to a patent, only where the invention has been in public use more than two years before the application. A man might justly be treated as having abandoned his application, if it be not prosecuted with reasonable diligence. But, involuntary delays, not caused by the laches of the applicant, should not work a forfeiture of his rights. In this case, the complainant did not commence the manufacture of his improved lock till some time after his application was on file. The delay was not in consequence of his laches; and, within a reasonable time after the decision of the court as to the extent of his invention, a patent was granted for that portion of it to which he was clearly entitled. Here is no abandonment, either by the letter or spirit of the statute, but a continual claim, amid difficulties arising either from the obtuseness of officers, or accidental but unavoidable delays of public tribunals." In the case before us, no part of this long delay of ten years is chargeable to any body except the plaintiff himself, unless it be the "obtuseness of the officer," who rejected his application in 1852. It certainly did not require ten years' deliberation on the part of the plaintiff for him to determine whether he would even attempt to overcome that "obtuseness." This long delay he does not pretend to excuse. It was, under the circumstances, not only not reasonable diligence, but it was no diligence at all. It was not only laches, but very gross laches.

The case of Adams v. Edwards, [Case No. 53,] also cited by the plaintiff, has no special bearing on the present controversy. The charge of Mr. Justice Woodbury conceded that an application might be abandoned, and, whether it had been in that case, was one question submitted to the jury. But, though, in that case, the patent was not granted till seven years after the first application was made, the original application was renewed, amended, and persisted in, until it was finally granted. The same patent was involved in the case of Rich v. Lippincott, [Id. 11,758,] cited by the plaintiff.

But the plaintiff relies particularly on the case of Dental Vulcanite Co. v. Wetherbee, [Case No. 3,810.] In that case, the facts are given by the reporter as follows: "It appeared, that John A. Cummings first made an application for a patent for his invention in 1855, and that the same was, after three examinations, finally rejected, upon appeal, by the commissioner of patents, in 1856. The application was not further appealed, and was not renewed till March 25th, 1864, when a new application was filed, upon which the patent issued. In the interval between the filing of the original application and that of 1864, the invention had gone into use to a considerable extent, with the knowledge and consent of the then applicant, proved there-

to; and it also appeared, that, during the same interval, the inventor had made certain assignments of interests in the invention. Certain letters of the patentee, and other evidence, were introduced, tending to show that the inventor had not relinquished his design of obtaining a patent, at any time between the date of the original application and the final allowance of the patent." [Dental Vulcanite Co. v. Wetherbee, supra.] The following are the remarks of Mr. Justice Clifford on this point: "The next objection to be noticed is, that the inventor abandoned his invention, because his application for a patent, which was made April 12, 1855, was rejected February 6, 1856, and because he did not appeal at all, or make any new application, until the 25th of March, 1864. Strong doubts are entertained whether any new application was necessary; but, if it was, it is believed to be well settled, that the second application must be regarded as having been filed in aid of the first, on which the rejection took place. Godfrey v. Eames, 1 Wall. [68 U. S.] 317. Actual abandonment is not satisfactorily proved; and it is not possible to hold, that any use of the invention, without the consent of the inventor, while his application for a patent was pending in the patent office, can defeat the operation of the letters patent after they are duly granted. Such delays are sufficiently onerous to a meritorious inventor, if his patent is allowed to have full operation after it is granted, but it would be very great injustice to hold, that any delay which the inventor could not prevent, should, under any circumstances, affect the validity of his patent." The plaintiff insists that the doctrine of that case is applicable to the one now before us, and fully supports the validity of his patent. We have, therefore, examined it with some care. The court evidently considered two questions as arising under that branch of the case—first, the relation of the last application to the first; and, second, that of actual abandonment of the invention while the application was pending. The first, if we correctly understand the remarks of the learned judge, seems to have been regarded as a question of law, which had been conclusively settled by the supreme court in Godfrey v. Eames, 1 Wall. [68 U. S.] 317: "Strong doubts are entertained whether any new application was necessary; but, if it was, it is believed to be well settled, that the second application must be regarded as having been filed in aid of the first, on which the rejection took place." And it is true, that the court, in the latter case, say: "In our judgment, if a party choose to withdraw his application for a patent, and pay the forfeit, intending, at the time of such withdrawal, to file a new petition, and he accordingly do so, the two petitions are to be considered as parts of the same transaction, and both as constituting one continuous application, within the meaning of the law." But this language of the court must be read in the light of the facts of the case before them. Those facts were, that "Godfrey, on the 31st of January, 1855, filed an application for a patent for boot-trees. This application the commissioner, on the 17th May, 1855, rejected for want of novelty. On the 24th April, 1857, within the time required by the rules, Godfrey submitted his case again. The old application was withdrawn, and a new one filed, simultaneously, the withdrawal fee of $20 going to make part of the new application fee of $30, and not in fact being received by the applicant." On these facts, the court might well regard the two applications as connected together by an unbroken continuity. That they did not intend to decide that every subsequent application for a patent should be deemed, in judgment of law, to relate back to the first, whatever the interval of time, or the intervening acts of the applicant between them, is clear; for, they immediately add: "The question of the continuity of the application should have been submitted to the jury. In directing them to return a verdict for the defendant, we think the learned judge who tried the cause in the court below committed an error." On that ground, a new trial was ordered.

On the second question, that of abandonment of the invention, the opinion in Dental Vulcanite Co. v. Wetherbee, as already cited, remarks: "Actual abandonment is not satisfactorily proved; and it is not possible to hold, that any use of the invention, without the consent of the inventor, while his application for a patent was pending in the patent office, can defeat the operation of the letters patent after they are duly granted. Such delays are sufficiently onerous to a meritorious inventor, if his patent is allowed to have full operation after it is granted, but it would be very great injustice to hold, that any delay which the inventor could not prevent, should, under any circumstances, affect the validity of his patent." We conclude, that the facts which the learned judge had in view when he made these remarks have been inaccurately reported. They speak of the knowledge and consent of the inventor to the use as having been proved; while the opinion refers to a use without the consent of the inventor. The onerous delays referred to in the opinion we infer to be the delays interposed by the action of the patent office. Those were the only delays which the "inventor could not prevent," or, at least, provide against, by notice to those whom he knew to be using his invention. Goodyear v. Hills, [Case No. 5,571a;] Gates v. Benson, (1870,) Dec. Com'r Pat. 65, Cartter, C. J.

Now, in the case before us, as we have already stated, we are constrained, by the undisputed facts, to hold, that the plaintiff abandoned his first application. In coming to this conclusion, we have not overlooked the cases of Pitts v. Hall, [Case No. 11,192,] and McCormick v. Seymour, [Id. 8,726,] cited by the plaintiff. But, in neither of those

cases, was this precise question before the court. In each, the point was, whether the inventor had abandoned his invention to the public within the two years next preceding his application for a patent. As Mr. Justice Nelson well remarked, in his charge to the jury, in Pitts v. Hall: "An abandonment or dedication may occur within the two years, and at any time down to the procurement of the patent. The mere use, or sale, however, of the machine, within the two years, will not alone, or of itself, work an abandonment. There must be something more, because the 7th section of the act of 1839, [5 Stat. 354,] permits the sale or use by the patentee at any time within two years before his application, without its operating to invalidate his right." And, again, in McCormick v. Seymour, the same learned judge informed the jury, that "the mere fact of making and selling an improvement or invention, or of putting it into public use, at any time within two years before the application of a patent, is not, of itself, an abandonment of the invention to the public. The right thus to use his invention before the granting of a patent is a right conferred on the inventor by the act of 1839." In both the cases cited, he charged, that where a defendant relies on an alleged abandonment of the invention to the public within the two years next preceding the application for a patent, he should be required to prove beyond reasonable doubt or hesitation. That is undoubtedly a sound rule. But the question now before us is, whether Bevin abandoned his application, made in 1852. On this question, we think the proof ample and conclusive. He filed his application, it was acted on by the office without delay, and rejected for a simple and intelligible reason. Instead of taking any steps to reverse the action of the office, he withdrew all his papers, including the application itself, except a single drawing, and then, for ten years, permitted his invention to go into notorious public use. During all this time the records of the patent office contained no evidence whatever of the character of his invention, or of his claims in regard to it. By inspecting this drawing left behind, nobody could tell what portion of the chimney or furnace was claimed as new, or of what the inventor supposed his discovery to consist.

But, we are told that the new application of 1862 must, in judgment of law, be deemed to relate back to the first one. We have already shown that the continuity of these applications is, according to the doctrine of Godfrey v. Eames, [supra,] a question of fact, and not of law. The evidence does not establish that continuity, either in fact or intent. The original application, although not formally and technically, was practically, withdrawn. The papers were taken from the office in 1852, and never returned. The application of 1862 made no reference to that of 1852, not even to the old drawing. When the application of 1862 was filed, there was

practically no prior application pending, to which it could relate back. It follows, that, as the application of 1852 was abandoned, and there was no continuity between that and the one filed in 1862, the latter must be deemed the original application, upon which alone the patent issued; and, as the plaintiff failed to make that application until after his invention had been in public use, with his permission, for nearly ten years, his patent is void.

This conclusion renders it unnecessary that we should consider the other question raised by the answer, whether the invention was abandoned after 1862. Let a decree be entered dismissing the bill, with costs.