## STANDARD AUTOMATIC MACH. CO. v. KARL KIEFER MACH. CO. (two cases.)

(District Court, S. D. New York. August 18, 1925.)

**1. Patents ☞51(1)—Prior use, though not open to the general public, held a public use, which invalidated a later patent.**

Prior use for years for commercial purposes of machines which anticipated that of a later patent, which use was known to numerous employees not pledged to secrecy and to occasional visitors, was a public use, which renders the patent invalid, though there was more or less of an attempt by the concerns using the machines to keep such use, as well as other of their processes, from the knowledge of the general public.

**2. Patents ☞52—Prior use may be public and anticipatory, though the persons who witnessed the use were not skilled in the art and did not understand the method of operation.**

It is not essential to a defense of prior public use that it must be established that persons who witnessed the use of an anticipating device were skilled in the art to which the use appertained, or that they understood and appreciated its method of operation.

**3. Patents ☞328—Gosselin, 1,416,345, and Pennock, 1,418,203, for bottle filling machines, held void for prior public use.**

The Gosselin patent, No. 1,416,345, for a vacuum filling machine, and the Pennock patent, No. 1,418,203, for a bottle filling machine, *held* void because of prior public use of machines embodying their essential elements.

In Equity. Two suits by the Standard Automatic Machine Company against the Karl Kiefer Machine Company. Decree for defendant in each case.

Decrees affirmed 18 F.(2d) 331.

Arthur H. Serrell, of New York City (Frank Keiper, of Rochester, N. Y., and Thomas Ewing, of New York City, of counsel), for plaintiff.

Cooper, Kerr & Dunham, of New York City (Alfred M. Allen, of Cincinnati, Ohio, and John C. Kerr, of New York City, of counsel), for defendant.

KNOX, District Judge. The above-entitled suits separately charge the defendant with the infringement of claims 20, 21, 23, 24, 29, 37, 38, 45, 47, 48, 51, 54, 56, and 60 of patent No. 1,416,345, for a vacuum filling machine, issued to plaintiff, as the assignee of A. J. Gosselin, upon May 16, 1922, and of claims 17 and 18 of patent No. 1,418,203, for a bottle filling machine, issued to Theodore E. Pennock, upon May 30, 1922, and now owned by Standard Automatic Machine Company. By stipulation between the parties, the suits were tried as one.

In addition to the usual defenses of invalidity of the patents, noninfringement and prior uses, the answer sets up a counterclaim that plaintiff, prior to the issuance of the patents, fraudulently represented that the machines now claimed to be infringed were protected by numerous patents, which covered broadly the entire art of automatically filling bottles, to the injury and damage of defendant.

Aside from the merits of the counterclaim, defendant's proof as to the prior use of the devices covered by plaintiff's patents, that are said to have been made by E. R. Durkee & Co. and Sharpe & Dohme, was so complete and substantial as to reduce the other defenses to positions of secondary importance. That this fact is conceded by plaintiff is evidenced by the commendably frank statement of its counsel, who, when asked if it were admitted that said uses constitute complete anticipation, replied:

"The Sharpe & Dohme, I do not admit as to the structure at all. I make no issue on that. The Durkee use constitutes anticipations of all but certain of the claims that we have named in our pleadings. Of course, I will go farther than that, and say, if you find that that is a use that can be employed against us, you will have done much toward cutting the heart of our case. I am not raising any question, except as to certain claims which I have mentioned. I do not mean to say that these are not important claims, but I mean, if you decide against us on that, there will be a great deal of damage done to us in any event."

The Durkee use is sought to be avoided upon the ground that it was of a secret nature, and therefore of no benefit and advantage to the public. With respect to this contention, plaintiff's counsel went on to say:

"I am prepared to maintain this proposition: That any one who, having made an invention, undertakes to reduce it to physical practice and uses it commercially for his own advantage, and keeps that to himself, has placed himself outside of the patent system, himself and his machine. * * * The question that is involved here is whether one who does such a thing has so placed himself out of the patent system that the public may not take advantage of what he has done to break the patent of another independent inventor, who subsequently has made the invention and patented it."

The foregoing expresses with reasonable accuracy the chief issue to be decided. With a view to expressing my conclusions upon the

matter, an attempt will be made to summarize the basic facts. Their relevancy, perhaps, may best be appreciated by first undertaking a brief description of the commercial embodiment of the patents. It consists of a vacuum bottle filling machine, of more or less complicated structure, by means of which a plurality of bottles may speedily be filled to a uniform height with liquid from a tank located beneath the level at which they are filled. This is acomplished without any waste of material and without danger of smearing or breaking the bottles. Furthermore, the machine is so arranged that it will not fill a bottle to which air gains admittance otherwise than through the neck. As bottles frequently contain airholes or are broken, this feature of the device is of decided advantage. So perfect and efficient is the operation of the machine that it excites the admiration of the layman who witnesses its use. At least, it was so with me. The working of the machine may be described in the words of Pennock:

"This system consists of a supply tank, which is below the bottles being filled. Connecting with this tank is the liquid or supply line. The nozzles in this exhibit are shown as parallel nozzles also to illustrate the system. As a general rule, they are one inside of the other. In connection with the supply tank is an overflow receptacle. In the operation of this machine the vacuum pump is turned on or starts to function. That creates a vacuum in the overflow receptacle. The overflow receptacle is air-tight. As soon as a vacuum is created there, that creates a vacuum at the lower end of the air line or suction nozzle. Around these two nozzles is a rubber gasket. The bottle is brought up in contact with this rubber gasket, making a tight seal. Immediately a vacuum is created in the bottle, if the bottle is whole. If it has got a hole in it, the air leaks into the bottle about as rapidly as the air is sucked out; but with a whole bottle a vacuum will be created in that bottle. This * * * puts a suction on the end of the liquid nozzle, which in turn draws the liquid from the supply tank, which is open to the atmosphere, up through the supply tube and into the bottle. The bottle fills up, and as soon as the liquid reaches the end of the overflow or suction air line the liquid begins to be sucked up through that line, and finally it is deposited in the overflow receptacle. * * * As soon as the bottle is filled, it is then removed from the nozzle and liquid in the pipe line, or in the supply line, or the supply tank to the liquid nozzle falls back towards the supply tank. In other words, there is no suction on the liquid nozzle immediately upon removal of the bottle."

The machine sells at a price ranging from $5,000 to $7,000, and, considering the price, together with the fact that about 156 have been sold, may be said to have met with considerable commercial success.

So much for the patented device and its unquestioned virtues and advantages. For the moment, I will pass by the prior art as represented by earlier patents, and take up the prior use of a very similar machine by E. R. Durkee & Co. That concern, as many of us know, is well established, and for many years has engaged in the spice and condiment business. One of its products is a widely known salad dressing, that is delivered to the retail trade in bottles. That business was begun in 1850 by the father of Eugene A. Durkee, its present owner, who has been connected with it for more than half a century. The plant has been conservatively and strictly managed. The employees of one department are not, and never have been, permitted to visit another. Persons not employed in the business were admitted upon rare occasions. When this was done, the visitor was furnished with a pass, which gave him entrance to a particular part of the plant. But upon a few occasions representatives of the Owens Bottle Machinery Company called at the bottling department of the establishment, for the purpose of examining bottles that had been sold to the Durkee Company, and with respect to which it had made complaint. At such times they saw, in operation, the machines that will hereinafter be described. They were also open to the view of some 40 to 75 operatives, mostly women, who were employed in the bottling department. But even they were discouraged from an intimate examination of the machines.

This restriction did not apply to a former partner of the present owner, the superintendent of the plant, the foreman of the bottling department, nor the handy man of the business, whose duty it was to make repairs. But each of them was supposed to respect the confidences with which he was intrusted, and the secrets that he might learn. Notwithstanding the discipline that was maintained, the employees seem to have been content, and remarkably well disposed toward the management. From time to time, some of them would suggest improvements in the way of producing and packing the company's product. If the suggestion met with approval, it would be adopted. All this was done with-

out any idea of obtaining a patent upon any improvement that might be made.

One of the improvements was the machine upon which the defense of anticipating prior use is made. It was built in the year 1907 by Leopold Rostetter, who, at the time of trial, had been employed in the Durkee factory for 32 years. The original idea was that of a man named Sondeman, a former superintendent of the plant. It was elaborated and put in practical application by Rostetter. The device was an upright wooden structure, containing "a vacuum chamber, a water trap, an overflow back into the container with a nozzle, the tables to raise the bottles up against the rubber and form a tight joint." Any overflow, after the bottle was filled, would go up the vacuum tube to the vacuum chamber. The shutting off of the machine would serve to open a valve, so as to permit the overflow to run back into the container. This latter usually consisted of a barrel placed beneath the bottle level.

Considering plaintiff's admission as to the anticipating character of the Durkee machine, it is not necessary, I think, to describe its construction in detail. The more important elements of its existence are that it, together with four or five counterparts, were in constant use for a period of 7 or 8 years, and that one of them, slightly dismantled, was produced upon the trial.

In April, 1914, a man by the name of Gilbert F. Helson entered the employ of the Durkee Company as a clerk. Thereafter he became superintendent of the plant, and came to know and understand the operation of the bottle filling machine previously made by Rostetter. Helson made several improvements on the machine, one of which was to raise the bottles to the filling nozzle through a pedal action, instead of a hand lever. Subsequently Helson applied for a patent on a bottle filling machine. He got into interference with Gosselin, and, in a practically undefended proceeding, priority of invention was awarded to Gosselin.

Coming now to the Sharpe & Dohme prior use, it is to be observed that the proof is indisputable of the existence in that plant of a machine that may fairly be said to anticipate substantial portions, if not all, of the Gosselin and Pennock patents. Indeed, the machines which were first placed in operation in 1909 have continued in use until the taking of testimony in these suits. Over that period of time they have served to fill 22,000,000 bottles of pharmaceutical preparations. The apparatus employed by Sharpe & Dohme is hand-operated. The nozzle is composed of two tubes, quite similar to that portion of the equipment in plaintiff's machines. There is, however, no pump to return the bottle overflow to the supply vessel, and, when the bottle into which the overflow is diverted is filled, the vacuum pressure is cut off and the bottle is emptied back into the supply.

As in the Durkee factory, the Sharpe & Dohme concern was not disposed to open the details of its method of doing business to all comers. It did have a large number of employees, who were not pledged to secrecy, and who came into close contact with the mode of operation of its bottle filling machines. Customers of Sharpe & Dohme were sometimes shown through the plant. Upon such occasions, the visitors would see the machines in operation; but they were not permitted to examine them in detail. Practically every spring medical and pharmacy students, attending schools in or near Baltimore, would make inspections of the plant. They would be shown various apparatus that would be in operation at the times of such visits. According to the testimony of the superintendent of the company's fluid extract department, the students had "an opportunity to observe." He continued:

"There is nothing hidden; we simply say this bottle is filled by vacuum, and we point to the apparatus; we point out the use of it to them, the advantage of it as between the vacuum and hand filling; show them that, when the vacuum is satisfied, it is shut off automatically, and by raising and lowering the nozzle you can stop it down here, or by adding on a washer there you can raise or lower the nozzle. We show it to them just in a general way. There is no attempt to describe it in detail."

There would be no attempt to evade questions, so far as the witness knows, but replies would not touch upon minute particulars.

In December of 1912, a man by the name of Fred L. Shelor and a brother were permitted to visit Sharpe & Dohme's plant in compliance with the request of the company's distributors at Richmond, Va. The Shelors saw the vacuum machines in operation, with the result that one of them thereafter became the patentee under letters No. 1,230,334, June 19, 1917, for a barrel filling apparatus, and No. 1,232,105, July 3, 1917, for a bottle filling apparatus. Both of them contemplated and disclosed the use of the vacuum principle.

The foregoing prior uses having been established by the high degree of proof exact-

ed by a long line of decisions, it remains to consider whether such uses, by reason of the somewhat secretive manner in which the anticipating machines were employed, shall be held not to invalidate the patents in suit. The proposition advanced by defendant is that a public use is not necessarily a use in public, nor a use by the public. In its support, I am referred to the decision of Mr. Justice Story in Reed v. Cutter, Fed. Cas. No. 11,645, where he said:

"If the invention is perfected, and put into actual use by the first and original inventor, it is of no consequence, whether the invention is extensively known or used, or whether the knowledge or use thereof is limited to a few persons, or even to the first inventor."

In reliance upon that declaration, Mr. Walker, in his work on Patents, at section 71, says that "this rule applies even to cases where that knowledge and use were purposely kept secret." He admits that a majority of the Supreme Court in Gayler v. Wilder, 10 How. 477, 13 L. Ed. 504, held that a single instance of prior knowledge and use will not negative novelty, if that use had ceased when the patent was granted, and that knowledge was forgotten until called to mind by a reinvention. But in that connection he draws attention to the fact that the Supreme Court took occasion to say in Coffin v. Ogden, 18 Wall. 120, 124 (21 L. Ed. 821), that "the prior knowledge and use of an anticipating device by a single person is sufficient to negative invention by a later comer."

In passing, it may be remarked that in the plants of Durkee & Co. and Sharpe & Dohme the uses were of commercial, practical machines, and were long continued, and that in each instance it is plainly inferable that more than five persons (the number who knew of the Erbe lock in Coffin v. Ogden) were more or less familiar with them.

But it is true, as urged by plaintiff, that some more recent pronouncements of the courts tend to indicate that a restricted, to say nothing of the secret, practice of an invention will not serve as an anticipation. Diamond Patent Co. v. S. E. Carr Co. (C. C. A.) 217 F. 400. The court there quoted, with approval, from the opinion of Judge Townsend in Acme Flexible Clasp Co. v. Cary Mfg. Co. (C. C.) 96 F. 344, the following:

"I therefore understand the law on this subject to be that the mere secret practice of a process or the physical presence of a product or manufacture in this country is insuffi-

cient as an anticipation, unless and until the public acquires, or has opportunity to acquire therefrom such knowledge as would enable one skilled in the art to practice the invention. Such alleged anticipation, whether by foreign printed publication or physical presence in this country, must so embody the complete patented article, or be so substantially like it, that a specification could be based thereon."

While the action of Judge Townsend in sustaining the patent before him was affirmed by the Circuit Court of Appeals for this circuit in 101 F. 269, the appellate tribunal, if it approved the above-quoted statement in its entirety, did not see fit to give it specific indorsement. The higher court was content to decide the case upon the ground that the evidence of the prior use asserted to defeat the patent was not sufficiently persuasive.

As opposed to possible implications contained in the statement of law as given by Judge Townsend, the Circuit Court of Appeals for the Sixth Circuit, in Twentieth Century Machinery Co. v. Loew Mfg. Co., 243 F. 379, reiterated what was said in Coffin v. Ogden, supra, to the effect that prior knowledge and public use by a single person of an anticipating device, revealed to the Patent Office, would require the denial of a patent on a later application.

In Macbeth Evans Glass Co. v. General Electric Company (D. C.) 231 F. 183, Judge Clarke, who later became a Justice of the Supreme Court, held that, where the discoverer of a formula and process relating to the manufacture of glass kept the same as a secret for nearly 10 years before applying for a patent thereon, in which period they were used by a company of which the discoverer was president, and were known to some of the company's employees, and their product was sold to the public, a patent thereafter granted on such formula and process was void both upon the ground of abandonment and of prior public use.

When passing upon the public use feature of the case, the court said that it could not agree with the claim that the decisions of Kendall v. Winsor, 21 How. 323, 16 L. Ed. 165, Egbert v. Lippmann, 104 U. S. 333, 26 L. Ed. 755, and Jenner v. Bowen (C. C. A.) 139 F. 556, "are authority to the point that a use designed to be kept secret may not be a public use of a patented formula, process, or product, convinced as [the court] is that these references by the various courts to the fact that the prior use of a subsequently pat-

ented invention was secret in character were intended to go no further than to point out that such secret use is evidence tending to show that the inventor did not intend or actually did not abandon his invention. But this is very far from saying that it is conclusive evidence that the right to a patent was not abandoned, or that the use made of it was not a public one."

Judge Clarke further declared that no case was cited to him where a patent has been held valid after a long commercial, but secret, use of it, upon the ground that such use was not a public one within the meaning of the patent statutes.

When the litigation, to which reference has just been made, reached the Circuit Court of Appeals for the circuit within which Judge Clarke sat, it was not found necessary to consider that portion of the lower court's decision which dealt with the question of public use, and the case was determined upon the ground that Macbeth had abandoned his invention.

Alleged prior uses of certain machines were said to invalidate the patent which was the subject of litigation in Mayer v. Mutschler (D. C.) 237 F. 657, and it was urged that such uses were private instead of public. Upon that branch of the case the lower court said: "But the various prior use machines in evidence were not privately used, * * * as that term is understood in the patent law. Although users in every instance kept all knowledge of the manner of running the machines and of their essential elements from competitors, to prevent simulation of the details of operation, the machines nevertheless were not infrequently shown to customers and others, and of course were familiar to many employees, which constituted a public use of what they contained." The decision in the foregoing case was reversed by the appellate court for reasons that throw no discredit upon what has just been quoted.

In Perkins v. Nashua Card & Glazed Paper Company (C. C.) 2 F. 451, Judge Lowell, after a review of numerous decisions, among them Kendall v. Winsor, supra, Bevin v. East Hampton Bell Co., 9 Blatchf. 50, Fed. Cas. No. 1379, and Heath v. Smith, 3 Ellis & B. 255, wrote that he understood the law to be that "actual knowledge of the invention need not have been derived by any one interested to practice it; it is enough that any one or more persons, not under a pledge of secrecy, saw the invention practiced, or even might have seen it if they had used their opportunities, provided it was in fact practiced in the ordinary way after being completed. And it must be held either that the workmen and visitors were a part of the public, or that they were persons from whom the public might have acquired the art without a breach of trust."

One of the cases cited by plaintiff upon this branch of the case is Zinsser et al. v. Kremer (C. C.) 39 F. 111, in which the court, in overruling a prior use defense, used these words: "In addition, however, is the important fact proved (by his own witnesses) that the use was strictly secret. Such a use is not important." The report does not set forth the facts upon which the court reached the conclusion that the use was "strictly secret." For such reason, the case is of little help in the present litigation.

[1] While the uses by Durkee & Co. and Sharpe & Dohme of the machines long antedating the patents in suit may be said to have had about them certain elements of secrecy, it is apparent that the uses were not "strictly secret." Both concerns had numerous practices that they did not wish to become public property, and it was for their protection, as well as that of the machines, that every one was not made welcome at the respective plants. As a result of the prior uses, the public has the Shelor patents. It had, also, the benefit of whatever labors that Helson contributed to the bottle filling art. Some of the latter were of enough value to induce plaintiff to purchase certain of his rights. The public, too, has had the benefit of being able to purchase certain liquid products bottled in the prior use machines at prices that, presumably, reflect a portion of the saving in labor and time that has been effected as a result of such uses.

If a man be permitted to visit a plant and there witness, without pledge of secrecy, a mode and method of operation of a patentable machine that is in commercial use, and he concludes that such a machine may serve in his own factory, or in that of another, I am aware of no reason, legal or moral, why he should not take advantage of what he has learned, and should not tell another of what may thus be accomplished. Such a standard of conduct may be desirable, but it does not exist.

[2] Nor do I think it essential to the validity of a prior use defense that it must be established that persons who witness the prior public use of an anticipating device understood and appreciated its method of operation. That, too, in a practical sense, is more than can be asked. A prior use of an inven-

tion may be public, even though the portion of the public who witnessed it are not skilled in the art to which the use appertained.

[3] To me the conclusion seems inevitable that the prior public uses here set up have been sufficiently established, and they will be sustained.

There are also, in the prior art, several patents of considerable pertinency. This is particularly true of Phelps patents, No. 1,-058,093 and 1,058,096, issued upon April 8, 1913. Considering the effect of the prior public uses set up in the defense, little time need be spent in a discussion of the Phelps disclosures. Suffice it to say that they are rather comprehensive dissertations upon the basic principle employed by both Gosselin and Pennock, and they contain matter which, in the absence of prior uses alleged against the patents in suit, would make a number of the claims in suit of extremely doubtful validity.

In this connection, it should again be stated that the claims which counsel for plaintiff do not concede to be anticipated by the Sharpe & Dohme and Durkee uses are Gosselin, Nos. 21, 23, 24, 45, 48, 54, and 60. The applicability of these claims, in view of the prior uses that have been sustained, has not been specifically pointed out, and, to my mind, it is not readily observable. For example, claim 21. It calls (1) for the combination of an air and liquid nozzle, adapted to produce a flow of liquid and a continuous suction of air with packing surrounding said nozzle (Durkee's device has all of this) ; (2) means for bringing said packing and the mouth of the bottle closely together, with the air and liquid nozzle inserted into the bottle from above (this is the platen arrangement, and Durkee had a foot-operated platen that made possible the performance of each of the specified functions) ; (3) means for thereafter separating the bottle and the packing (this is done by lowering the platen after the bottle has been filled, and it was done in the same way by Durkee) ; and (4) a tank from which the bottles are filled by suction, said tank being located below the bottles. (Each of these elements was embodied in the Durkee machine.)

In so far as the remaining claims declared upon cannot literally be read upon the prior use machines, I am of opinion that they contain nothing, over the device of the prior art, that can properly be said to be patentable.

There are numerous other features and details of the controversy, among them de-

fendant's counterclaim, that might well be discussed; but, beyond expressing the emphatic disapproval of the court upon the conduct of plaintiff in marketing and advertising its earlier machines with representations that they were protected by nonexistent and nonapplicable patents, it would be idle to extend my remarks.

Both bills of complaint will be dismissed, and similar action will be taken with respect to the counterclaim.