## MACBETH EVANS GLASS CO. v. GENERAL ELECTRIC CO.

(District Court, N. D. Ohio, E. D.    January 27, 1916.)

### No. 303.

1. PATENTS ⊙75, 83—VALIDITY—"ABANDONMENT"—"PRIOR PUBLIC USE."
    The primary purpose of the patent laws is to promote the progress of science and the useful arts by bringing into general use discoveries which may be made from time to time by inventors; and where the discoverer of a formula and process relating to the manufacture of glass held the same as a secret for nearly 10 years before applying for a patent therefor, during which time they were used by a corporation of which he was president and a stockholder, were known to some of its employés, and their product was sold in the market, a patent thereafter granted is void under Rev. St. § 4886 (Comp. St. 1913, § 9430), upon the ground of abandonment of the right to the same and also upon the ground of prior public use.

    [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 92–97, 108, 109; Dec. Dig. ⊙75, 83.

    For other definitions, see Words and Phrases, First and Second Series, Abandonment; Prior Public Use.]

2. PATENTS ⊙328—VALIDITY—PROCESS FOR MAKING GLASS.
    The Macbeth reissue patent, No. 13,766 (original No. 1,097,600), for a formula and process for making glass, held void for abandonment and prior public use.

Suit in equity by the Macbeth Evans Glass Company against the General Electric Company. On final hearing. Decree for defendant.

Tolles, Hogsett, Ginn & Morley, of Cleveland, Ohio, for plaintiff.

Squire, Sanders & Dempsey, of Cleveland, Ohio, for defendant.

CLARKE, District Judge. In this cause infringement is claimed of United States reissued letters patent No. 13,766 dated July 7, 1914, and issued to the plaintiff as assignee of the inventor, George A. Macbeth. The original patent, No. 1,097,600, is dated May 19, 1914. This hearing was had upon the defense stated in paragraph 14 of the defendant's answer under an order of court entered pursuant to Supreme Court Equity rule No. 29 (33 Sup. Ct. xxvi).

[1, 2] The parties to the suit for the purpose of the hearing stipulated the relevant facts, which may be succinctly stated as follows, viz.:

(1) That prior to the fall of 1903 the patentee, Macbeth, "discovered and perfected" the formula and process which is the subject-matter of the patent relied upon.

(2) That about the fall of 1903 the plaintiff company, of which Macbeth was president and a stockholder, commenced the use of the formula and process for the manufacture of glass, and continued to

---

so use them until the application for original letters patent was filed on May 9, 1913; that large quantities of the glass were sold during those years in the open market for profit; but that the formula and process were treated as secret inventions.

(3) Harry A. Schnelbach, a trusted superintendent, and C. H. Blumenauer, a salesman of the plaintiff, with knowledge of the secret formula and process in May of the year 1910, left the employ of the plaintiff, and, entering the employ of the Jefferson Glass Company, disclosed the formula and process to their employer; that that company proceeded to use them in the manufacture of glass which prior to December 17, 1910, it placed upon the open market; and that it continued to so use the formula and process and to manufacture and sell the glass until after the application for the original letters patent on May 9, 1913.

(4) That on December 17, 1910, the plaintiff commenced suit to enjoin the Jefferson Glass Company and Schnelbach and Blumenauer from disclosing said secret formula and process to others, and from further manufacture of glass by use of them. During the prosecution of this suit, the formula by agreement of counsel was kept secret, being disclosed to the court by the use of a code. A preliminary injunction was allowed, and on May 12, 1913, a decree was entered by the court of common pleas of Allegheny county, Pa., enjoining the defendants in that suit from disclosing the secret formula and process, and from manufacturing glass by use of them. On January 6, 1913, the Supreme Court of Pennsylvania on appeal affirmed this decision. The application for the letters patent in suit was filed on May 9, 1913.

Upon these facts substantially alleged in paragraph 14 of the answer, the defendant claims that, by the course of action described and admitted, the plaintiff and Macbeth forfeited any right to a patent which the latter may have had as an inventor of the formula and process, and any right which they or either of them had to obtain the patent protection declared on in this suit.

This state of facts presents two questions which are now before the court for decision, viz.:

(1) Does the manner in which the inventor dealt with his invention, as shown in the stipulation quoted, constitute an abandonment of it within the meaning of U. S. R. S. § 4886 (Comp. St. 1913, § 9430)?

(2) Does the manner in which the inventor permitted the plaintiff to use his formula and process, and to sell the resulting product or composition of matter in the open market for almost ten years, constitute a public use, or show that it was on sale for more than two years prior to the filing of his application for a patent on May 9, 1913, within the meaning of said section No. 4886 (section 9430).

The industry of counsel and of the court has failed to discover any decision of these questions by any court, and therefore they must be decided upon principle unaided by direct authority.

Letters patent are issued pursuant to statutory provisions, which, so far as the decision of this case is concerned, have not been greatly modified since the patent act of 1793 (Act Feb. 21, 1793, c. 11, 1 Stat. 318).

Fortunately, so early as 1829 the fundamental purpose and principles of our patent laws were fully discussed by Justice Story in Pennock v. Dialogue, 2 Pet. 1, 7 L. Ed. 327, in his usually illuminating and thorough manner, which leaves so little to be desired.

Our patent statutes have all been enacted under the power granted to Congress by the Constitution of the United States, art. 1, § 8, cl. 8:

"To promote the progress of science and the useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries."

And Justice Story, in the case cited, declares that:

While one object of such laws is to encourage inventors and to stimulate genius, yet their main object is "to promote the progress of science and the useful arts; and this can be done best by giving the public at large a right to make, construct, use, and vend the thing invented, at as early a period as possible, having due regard to the rights of the inventor. If an inventor should be permitted to hold back from the knowledge of the public the secrets of his invention; if he should for a long period of years retain the monopoly, and make and sell his invention publicly, and thus gather the whole profits of it, relying upon his superior skill and knowledge of the structure; and then, and then only, when the danger of competition should force him to secure the exclusive right, he should be allowed to take out a patent, and thus exclude the public from any further use than what should be derived under it, during his fourteen (now seventeen) years—it would materially retard the progress of science and the useful arts and give a premium to those who would be least prompt to communicate their discoveries."

Thirty years later, the Supreme Court, in Kendall v. Winsor, 21 How. 322, 16 L. Ed. 165, quotes with approval this language of Justice Story, and adds:

"It is undeniably true that the limited and temporary monopoly granted to inventors was never designed for their exclusive profit or advantage. The benefit of the public or community at large was another and doubtless the primary object in granting and securing that monopoly."

After discussing the subject at some length, the decision continues:

"By correct induction from these truths, it follows that the inventor who designedly, and with the view of applying it indefinitely and exclusively for his own profit, withholds his invention from the public, comes not within the policy or objects of the Constitution or acts of Congress. He does not promote, and if aided in his design would impede, the progress of science and the useful arts. And with a very bad grace could he appeal for favor or protection to that society which, if he had not injured, he certainly had neither benefited nor intended to benefit."

Whether or not these conclusions, as to what are the principles upon which our patent laws are founded, were strictly necessary to the decision of the cases in which they were expressed, commending themselves as they do to sound thinking, they must be accepted as a correct statement of the principles and policy of that law which should guide us in the application of it to this cause.

It is palpably clear, from the admissions upon which this hearing proceeds, that Macbeth and the plaintiff decided in 1903 that they would rely upon their ability to keep the discovery of Macbeth a secret as long as they could without the aid of the patent laws. They made no application for a patent for nearly ten years, and when after seven

years, through the exposure by trusted employés, the formula and process became known and came into use by others, still neither Macbeth nor the plaintiff applied for the protection of the patent laws, but, on the contrary, elected to still depend upon their common-law right to maintain the discovery as a trade secret.

They continued in this attitude of mind through two years of litigation, until their right to the trade secret was established by the Supreme Court of Pennsylvania on January 6, 1913, and, even when this right was thus seemingly established at least for the state of Pennsylvania, they did not elect to apply for a patent until four months later, on May 9, 1913.

What occurred in the interval between January 3 and May 9; 1913, to change the purpose of Macbeth and the plaintiff, does not appear; but their actions show that it was not until the latter date that they decided to abandon the monopoly of a trade secret for an indefinite length of time, and to make application for the patent monopoly for seventeen years.

Thus do the facts stipulated make it entirely clear to this court that the settled purpose of Macbeth, the inventor, and of the plaintiff from the very beginning, was to avoid compliance with the patent laws as long as they could maintain a monopoly without their aid, and that, when that was no longer possible, their purpose was then to apply for, and if possible obtain, a patent monopoly for seventeen years longer.

An inventor guilty of such conduct "comes not within the policy or object of the Constitution or acts of Congress" with respect to patents and to approve it by permitting a valid patent to be issued to such a one would not promote, but would impede, the progress of science and the useful arts.

The patent law in effect during the time under consideration in this case provided that any person who invented or discovered any new and useful manufacture or composition of matter not known or used by others in this country, unless the same is proved to have been abandoned, may obtain a patent therefor.

We do not have here the case of mere delay on the part of an inventor to apply for a patent, nor the case so frequently discussed in the books of delay upon the part of an inventor because of poverty or sickness, or other insurmountable obstacle, or for purposes of experiment while perfecting his invention; but, upon the contrary, we have many years of delay, after the invention was perfected, coupled with a continued, extensive use by the public for commercial purposes of the product of the invention.

While it is true that abandonment is a question of intention, yet proof of that intention may be derived from the acts of the parties just as certainly as from their declarations, and it is difficult to imagine more satisfactory evidence of it than we have in this case.

To decide and to act on that decision for many years, not to accept the benefit of the patent laws, but to rely upon the trade secret law for protection of an inventor, is as clear an abandonment by him of the privileges and obligations of the patent law as the abandonment of its advantages in any other manner would be. For these reasons, it

seems clear that the plaintiff and Macbeth were not entitled to the patent in suit when their conduct is judged by either the letter or the spirit of our patent laws.

As we have said, there seems to be no decision sufficiently in point to rule the questions presented by this cause; but such decisions as there are upon analogous states of fact are all confirmatory of the conclusion we are reaching. The chief of these cases are: Spear v. Belson, 1 McArthur Pat. Cas. 699, Fed. Cas. No. 13,223; Lovering v. Dutcher, 2 Hayw. & H. 367, Fed. Cas. No. 8,553; In re Appeal of Mower, 15 App. D. C. 144; and Walker on Patents (4th Ed.) § 91.

The very absence of controlling decision on a state of facts such as we have in this case, and which must have frequently arisen in the past, strongly suggests that the profession has been slow to advise applying for a patent under such conditions, and that the government has been yet slower in granting patents where such conditions were disclosed. The absence of authority supporting such patents is of itself an important authority against them.

We must come to the same conclusion as that at which we have arrived if we consider the claim of the defendant, that the plaintiff made public use of the invention of Macbeth more than two years prior to the application for the patent in suit on May 9, 1913.

It appears from the stipulation, that as early as 1903, under a permission from Macbeth, the precise character of which does not appear, the plaintiff began the manufacture and sale of glass according to the formula and process subsequently patented, and that two men at least, Schnelbach and Blumenauer, knew of and used the invention. The implication is imperative that many others must have known of it during the long use of it by the plaintiff, a corporation.

Such a use as this is certainly a public use within the meaning of the decisions of the courts, unless it is saved from being such, as the plaintiff claims it is saved, by the fact that the formula and process were maintained "as secret inventions." It is to be noted that the use made of the invention was after it was perfected and without any pretense of the use being one for experimentation.

The plaintiff, in support of this claim that the use of the formula and process, being under cover of attempted secrecy, were therefore not a public use within the meaning of the law, cites many decisions from which expressions such as these are culled, viz.:

Kendall v. Winsor, 21 How. 323, 16 L. Ed. 165:

But "he kept the machines from the view of the public, allowed none of the hands employed [by him] to introduce persons to view them, and the hands pledged themselves not to divulge the invention."

Egbert v. Lippmann, 104 U. S. 333, 26 L. Ed. 755:

"If an inventor, having made his device, gives or sells it to another, to be used by the donee or vendee, without limitation or restriction, or injunction of secrecy, and it is so used, such use is public, even though the use and knowledge of the use may be confined to one person."

Jenner v. Bowen, 139 Fed. 556, 71 C. C. A. 540 (C. C. A. 6th Circuit) decided by Judge Lurton:

"We have examined the evidence upon this subject with a good deal of care, being inclined to save this patent, if it could be done under the law, but only to find that neither the inventor nor Bowen used any of the precautions usual when it is desired to keep an invention secret."

This court cannot agree with the claim that these decisions are authority to the point that a use designed to be kept secret may not be a public use of a patented formula, process, or product, convinced as it is that these references by the various courts to the fact that the prior use of a subsequently patented invention was secret in character were intended to go no further than to point out that such secret use is evidence tending to show that the inventor did not intend or actually did not abandon his invention. But this is very far from saying that it is conclusive evidence that the right to a patent was not abandoned, or that the use made of it was not a public one.

No case has been cited to the court where a patent has been held valid after a long commercial but secret use of it, upon the ground that such a use was not a public one within the meaning of the patent statutes.

In Egbert v. Lippman, 104 U. S. 333, 26 L. Ed. 755, it is decided that a use of an invention may be public, "although but a single machine or device for which the letters were subsequently granted was used only by one person."

And in Hall v. MacNeale, 107 U. S. 90, 2 Sup. Ct. 73, 27 L. Ed. 367, the use of certain specially constructed bolts in two safes where they were hidden from view after the safes were completed, and where it required the destruction of the safes to bring them into view, was decided to be a public use for the reason that the use of such bolts in the safes was necessarily known to the workmen who put them in.

In this case, as we have said, the knowledge of the formula and process as distinguished from the product was communicated to a number of persons, and was by them as employés of the plaintiff used to produce the product which was largely sold on the open market. Precisely the same use was made of the formula and process as would have been made of them if they had been published, and shall the fact that the limited number of persons allowed to know the details of the invention were enjoined to secrecy convert what was clearly a much more public use than that in either Egbert v. Lippman, or in Hall v. MacNeale, supra, into one that is not public? A private injunction should not be given any such authority, especially when given for the purpose of defeating the policy of our patent laws.

I cannot bring myself to conclude that he who deliberately offends against the chief purpose of our patent laws, by withholding from the public generally the knowledge of an invention for nearly ten years, can nevertheless enjoy the benefits of the monopoly granted by such laws, because he has by special injunction kept his invention secret from more than a limited number of persons to the end that his monopoly without the protection of the patent laws might be continued longer than the period prescribed by those laws.

The plaintiff also makes the claim that an inventor may keep secret his invention as long as he chooses, and nevertheless obtain a patent,

because the patent statutes do not prescribe any time within which an application for a patent must be filed after an invention is perfected.

The cases chiefly relied upon as authority for this claim are Bates v. Coe, 98 U. S. 31, 25 L. Ed. 68, and Parks v. Booth, 102 U. S. 96, 26 L. Ed. 54. The opinion in each of these cases was written by Justice Clifford. Of the former of them, it is sufficient to say that the justice writing the opinion says that the subject he is discussing when he uses the language quoted was not in issue in the case, and in Andrews v. Hovey, 124 U. S. 694, 8 Sup. Ct. 676, 31 L. Ed. 557, the Supreme Court says of a passage immediately following that quoted from Bates v. Coe, 98 U. S. 31, 25 L. Ed. 68, and, while discussing the same point, that this "was an observation made in regard to a point not in issue or in judgment."

As to the expression relied upon in Parks v. Booth, it is found in a discussion of the proper practice in patent cases under the pleading prescribed by statute which concludes as follows:

"Subject to this explanation, it is clear that there is no proof in this case that the complainant was guilty of any laches in applying for a patent, or that his improvement ever went into public use or was on sale in this country before he applied for his patent."

Upon this claim other cases are cited by the plaintiff which it is not necessary to discuss, for the reason that in not one of them was the question we are discussing in issue.

It is also argued by the plaintiff that while it must be admitted that, if another discovers the invention while it is being kept secret, the first inventor cannot patent it, yet, so long as no person does make a second discovery of it, the right to a patent remains with the first discoverer. No decision of any court is cited in support of this claim, but various decisions are called to the attention of the court wherein expressions like this are found:

"It was not until after the several patents above specified had been obtained by others  *  *  *  that Mason, nine years after his alleged invention, comes forward to claim the exclusive right to make such jars. If he originally might have claimed it, he had slept too long." Consolidated Fruit Jar Co. v. Wright, 12 Blatch. 149, Fed. Cas. No. 3,135.

Bates v. Coe and Kendall v. Winsor are also cited in support of this claim.

Upon expressions culled from these more or less applicable decisions is based this claim that while, if rights of third parties making the same discovery intervene, the first discoverer may not secure a patent, yet, if such private rights do not arise, the right for the patent continues indefinitely.

To grant this conclusion would be to go much beyond the scope of any of the decisions cited to this court, and would do violence to the conclusion reached, as we have seen, by the Supreme Court in the cases cited, that the primary and dominant purpose of the patent laws is the public one of promoting the useful arts and sciences by bringing into general use discoveries which may be made from time to time by inventors. That private rights have not intervened during the delay in taking out a patent cannot therefore be conclusive on this point, be-

cause the right of the public, the dominant right created by the patent law, springs into existence as soon as the discovery is made, and does not wait upon a second discovery by another person. This public right, being the ruling one of the law, is more potent to defeat the right to a patent on account of delay in applying for it, than any private right can possibly be.

For these reasons, the decisions cited are not persuasive to the point that the right of an inventor continues perfect as against the public until private rights intervene to imperil it.

It results from this discussion that the defense stated in paragraph 14 of the defendant's answer will be sustained. The patent described in the bill will be decreed to be void because the discovery was used in the manner stated in the stipulation for almost ten years before the patent in suit was applied for, and was therefore abandoned, and also because the invention described in the patent was in public use more than two years prior to the application of the patent.

The bill will be dismissed, at the plaintiff's cost.