MAYER v. MUTSCHLER et al.

(District Court, W. D. New York. November 2, 1916. On Petition for Rehearing, December 7, 1916.)

1. PATENTS &⇒26(2)—INVENTION—NEW COMBINATION OF OLD ELEMENTS.
    An invention is patentable, where it consists entirely of old and well-known ingredients or elements, provided a new and useful result is thereby attained.
    [Ed. Note.—For other cases, see Patents, Cent. Dig. § 29; Dec. Dig. &⇒26(2).]

2. PATENTS &⇒58—ANTICIPATION BY UNPATENTED DEVICE.
    Where a patented device is claimed to be anticipated by one that is unpatented, it must be proven that the anticipating structure was capable of practical and successful use.
    [Ed. Note.—For other cases, see Patents, Cent. Dig. § 75; Dec. Dig. &⇒58.]

3. PATENTS &⇒75—PRIOR USE—PUBLIC USE.
    Where alleged prior use machines were shown to customers and were familiar to employés using them, their use was a public use within the meaning of the patent law, although they were kept secret from competitors.
    [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 92–97; Dec. Dig. &⇒75.]

4. PATENTS &⇒75—PRIOR PUBLIC USE.
    The sale of the product of a machine which is still being experimented with and improved, and the use of which is kept secret, does not take the machine out of the experimental stage, so as to constitute a public use, to invalidate a subsequent patent for the completed machine.
    [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 92–97; Dec. Dig. &⇒75.]

5. PATENTS &⇒328—VALIDITY AND INFRINGEMENT—PAPER COATING MACHINE.
    The Mayer patent, No. 1,043,021, for a machine for coating paper, mainly adapted for coating paper with carbon, etc., and the essential feature of which is the assembling of coating roll, equalizer, and finishing or smoothing roll so closely together as to eliminate as far as possible exposure of the paper to the atmosphere after coating and before chilling or annealing, was not anticipated, discloses invention, and is not void for prior public use; also *held* infringed.

In Equity. Suit by Charles W. Mayer against A. & H. G. Mutschler, the Rochester Wax Paper Company, and Daniel J. Coakley. On final hearing. Decree for complainant against the defendants other than Coakley.

Dominick & Ryan, of Buffalo, N. Y., for complainant.
Church & Rich, of Rochester, N. Y. (Frederick F. Church, of Rochester, N. Y., of counsel), for defendants.

HAZEL, District Judge. The bill alleges infringement of patent No. 1,043,021, issued to complainant October 29, 1912, for a coating machine mainly adapted for coating waxed paper, carbon paper, or any kind of paper with sensitized emulsion coating. The defendants A. & H. G. Mutschler manufacture coating machines at Rochester, N. Y., which are claimed to be infringements of the Mayer patent in

&⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

suit, the Rochester Wax Paper Company is a user of said machine, while the defendant Coakley is charged with conspiring with the other defendants to manufacture and sell the same.

Coating machines for applying to paper single or double coats were old, having been used for many years prior to the invention in suit. In such machines the paper travels from a supply roll to a coating roller, usually made hollow for holding steam or hot water, which revolves in a bath of coating material to keep it in a fluidous condition, so that when the paper comes in contact with it a quantity of the material adheres to its surface. The paper then passes to one or more idler rolls of varying size before it reaches a knife, scraper, or so-called equalizer, which distributes the coating, removing excess quantities from the paper. In some of the older devices the equalizer was adjustable for thin or heavy coating. Other rolls were also positioned in the frame of the machine beyond the equalizer for tensioning the paper, and in the patent under consideration there is a roller or smoother adjacent to the equalizer, with steam and cold water connections for heating or chilling the coating. Heating the coating produces a dull finish, while chilling it produces a bright or glossy finish. The specification says:

"When the machine is used for coating paper on one side, the coating roller 33 and the square tube 54 are heated, preferably by steam, while all the other rolls in the machine are cooled by the circulation of cold water through them or are left of neutral temperature. When the machine is used for coating both sides of the paper, the coating roller 33 and the square tube 54, the roll 38, the coating roll 72, and the tube 85 are heated; the remainder of the rolls being cooled or left of neutral temperature. The operation of the machine may be varied. For example, in coating the paper on one side the roller 33 and the square tube 45 may be run hot, and the roller 38 and the roller 72 may also be run hot, leaving the paper to cool gradually as it passes under the fan 104; it being my experience that, when the paper is chilled quickly by keeping the roller 38 cold, a gloss surface will be left on the paper, while, if the paper is kept warm for a considerable period of time, the solution will soak into the paper and more thoroughly impregnate it, and when dry it will have a dead finish instead."

The patent also includes a roller at the back end of the machine having a friction drive, for winding up the coated paper. The defenses are anticipation, prior use, and disclosure, limitation of claims, and noninfringement.

[1] It is undeniable that all the elements of the disputed claims were old and are found in prior publications in evidence, but the manner of their combination and arrangement was new and novel. If such rearrangement had simply produced a cheaper or a superior article, it would scarcely be regarded as a patentable invention; but it produced a machine of a distinct character, in which the combined elements function differently than in any of the prior art structures. An invention is patentable, as is well settled, where it consists entirely of old and well-known ingredients or elements, provided a new and useful result is thereby attained. Seymour v. Osborne, 78 U. S. (11 Wall.) 516, 20 L. Ed. 33; Griswold v. Harker et al., 62 Fed. 389, 10 C. C. A. 435.

At the date of the Mayer invention the art was presented with the problem of how to improve the quality of carbon paper without

great waste in production. It was substantially proven that only about 25 per cent. of the coated paper produced by known coating machines was marketable. The patentee, after much experimentation, ascertained that by assembling the coating roll, the equalizer, and the finishing roll close together within the frame of the machine, in such a way as to accelerate the spreading and annealing or tempering of the coating, and at the same time co-operate with the feed and tension mechanism, waste was decreased, and a better quality of paper produced. The patentee became satisfied that the intervention of idlers or tension rolls, or even subjection to the atmosphere for any appreciable length of time, interfered with proper chilling or annealing of the coating; therefore he arranged the equalizer close to the coating roll and the smoothing roll *38* close to the equalizer, thus eliminating everything between the essential instrumentalities which would tend to affect the temperature or the course of the paper. As said by complainant's expert, he eliminated "the cold zone of the prior art extending from equalizer to the cooling or annealing roll." The specification, in stating his purpose, says:

"The position of the smoothing roll *38* close to the equalizing bar *56* and to the dope roll is important, whether the roll *38* be run hot for annealing the paper or cold for chilling it to produce a gloss surface, since in either case it is necessary that this roll act on the paper before its chilling from contact with the atmosphere commences. After such chilling begins, the coating cannot thereafter be releveled and smoothed to make a perfect coat."

It will be observed, as heretofore pointed out, that roll *38* and the equalizer bar are required to be in a position of immediacy to the dope roll, with no intervening idler in the path of the paper as it travels from the coating roll to roll *72*, which acts as a chilling or annealing medium.

The claims involved are the first, second, third, fourth, seventh, eighth, fourteenth, fifteenth, forty-seventh, forty-eighth, and forty-ninth. Claims 1 to 4, inclusive, are for the broad invention; claims 7 and 8 specify the combination with an adjustable equalizer; claim 14 relates to the feeding and tensioning means; claim 15, to the adjustable equalizer; claim 47, to the smoothing roll *38*, combined with roll *72*, and their location in the frame of the machine, permitting easy inspection of the coating; claim 48, to tensioning mechanism; and, finally, claim 49, to cooling means. Claim 1 reads as follows:

"1. A machine for coating paper, comprising means for feeding paper under tension, means for coating the paper as it is fed, an equalizing device adjacent said coating means arranged to receive the paper therefrom before it touches another object, and a roll for releveling and smoothing the paper, arranged to receive the paper web directly from the equalizing device, said roll being arranged adjacent said equalizing device."

The defendants contend that the Mayer patent in suit was anticipated by the Bedells British patent, No. 2,720 of 1858, which it is said discloses the identical arrangement of elements and parts; but the Bedells specification clearly indicates the presence of a cold zone, as the web, after passing a dope roll and scraper, contacts with two idlers before it reaches the roller *11*, and therefore it is not anticipatory. The patent to How, No. 739,313, for impregnating paper, as distinguished

from coating it, includes, true enough, all the essential elements of the patent in suit; but, as in the Bedells patent, it had intervening idlers, back of the scrapers, which from the point of view of Mayer were objectionable features, and the distance from the idler to the finishing roll was such as to create a cold zone. The British patent to Lake, No. 11,453, was for a carbon paper making machine, wherein the paper passed from a dope roll into contact with a steam-heated scraper or equalizer, and then under a guide roll; but an idler was interposed between the dope roll and the scraper, and therefore the efficiency claimed to be secured by complainant's arrangement of parts, eliminating intervening objects and the cooling zone, was not attained.

The patents to Hammerschlag, Pembroke, and Pulsifer are also distinguishable from the Mayer patent, in that they belong to a type of machine operating on a different principle; i. e., by scrubbing or wiping the dope into the paper. In the Pembroke patent, for instance, the coating roll was purposely rotated slower than the paper, so that the coating could be wiped on, and the paper then passed to a heated drum, where the dope was scrubbed in by a vibrator device having toothed edges for bearing against the paper. In making highly glossed paper, the paper was heated in the Pembroke machine by a gas flame before traveling to the dope roll, while a dull finish was obtained by turning off the gas and allowing the roll to run cold. By this method the paper was impregnated, and not coated, as by complainant's method, and therefore such patents, wiping or scrubbing the dope into the paper, were not anticipations.

### The Prior Use Defenses.

[2] To supersede a patent, the prior use of an invention must be a public and not a private use; but just what constitutes a public use had been the subject of numerous adjudications. Where the original invention was a part of an incomplete machine, a use kept secret until after another inventor obtained a patent for the same invention was not regarded as public. The rule is that, where a patented device is claimed to be anticipated by one that is unpatented, it must be proven that the anticipating structure was capable of practical and successful use.

[3] But the various prior use machines in evidence were not privately used, as claimed by complainant, as that term is understood in the patent law. Although users in every instance kept all knowledge of the manner of running the machines and of their essential elements from competitors, to prevent simulation of the details of operation, the machines nevertheless were not infrequently shown to customers and others, and of course were familiar to many employés, which constituted a public use of what they contained. Walker on Patents (4th Ed.) § 71; Reed v. Cutter et al., Fed. Cas. No. 11,645; Egbert v. Lippmann, 104 U. S. 333, 26 L. Ed. 755; Macbeth Evans Glass Co. v. General Electric Co. (D. C.) 231 Fed. 183.

Much testimony was submitted to anticipate the Mayer patent in suit by the Republic-Dodge machine, built in 1906, and by various prior coating machines built by Mayer and sold in 1907 to Archbald,

who rebuilt them in 1908, selling two of them to the International Carbon Paper Company. Diagrams, photographs, and sketches of such prior machines, and testimony in relation thereto, prominently challenge the validity of the claims in suit. Indeed, the evident similarity between the Republic-Dodge coating machine and the coating machine described and claimed in the patent under consideration is quite striking, as will readily be perceived on inspection. Complainant, however, contends that the testimony of the defendants in support of prior use is so dubious that it should be disregarded, and that the photographs and drawings of such machines (Exhibits 43, G. H. I, and 44), when closely scrutinized in connection with the evidence explanatory thereof, indicate clearly that the prior constructions failed to embody the patentee's method of assembling the equalizer bar adjacent to the coating roll for immediately receiving the paper therefrom and the smoothing roll adjacent to the equalizer to eliminate the injurious cooling zone.

Blueprint (Exhibit No. 4) produced in response to complainant's interrogatory No. 60 correctly outlines the Republic-Dodge machine as it existed at the time the blueprint was prepared, and assists in following the path of the paper, which, after leaving the supply roll, passes about idler rolls, an oilcloth covered drive, two other idlers, and thence to the dope roll $G$, from which it passes over the scraper $H$ to the under side of a stationary heating drum $I$, and thence to a cooling roll $J$, past idlers, and over rolls $M$ and $N$, to the wind-up roll $O$. Archbald swears that there is also a vibrator $17$ near the drum which bears against the coated paper while on the drum, spreading and impregnating it. Exhibit 44, prepared by counsel for the defendant, as illustrative of the Republic-Dodge machine, is claimed to show the precise arrangement of the essential parts of the Mayer patent; but on careful inspection it will be seen to vary from blueprint No. 4, in that the paper on leaving the dope roll passes immediately to the cooling roll $J$, instead of first passing around the heated drum. It was, however, explained that the paper traveled around either the heated drum or the cooling roll in the Republic-Dodge machine, according to the finish desired, and that when it passed directly to roll J from the dope roll the mode of operation was substantially the same as in complainant's patent. If I were satisfied that such was the true path of the paper, my conclusion would be that the Republic-Dodge machine anticipated the broad claims of the patent in suit; but a comparison of Exhibit 44 with blueprint No. 4 shows the impracticability of the Republic-Dodge machine, as the paper therein passes clear of the equalizer and does not contact with it. Moreover, the blueprint shows no means for adjusting the scraper to come in contact with the paper in its run to the cooling roll, and as bearing upon its absence Archbald testified that since acquiring the Republic-Dodge machine (which occurred after this action was begun) he remounted the equalizer, adapting it for lowering or raising to contact the paper as desired. Accordingly I do not agree that such exhibits are corroboratory of Archbald's general testimony, or that the entire showing is of sufficient weight to induce the conclusion that the Republic-Dodge machine an-

ticipates claims 1 to 4, inclusive, 7 to 15, inclusive, and 48 and 49 of the patent in suit. I think the drum heater and vibrator were intervening objects injuriously affecting the paper on its way from the equalizer to the cooling roll 10, an objection that the patentee designed to overcome by providing means for running the paper directly to the smoothing roll adjacent to the dope roll, thus "eliminating, or as nearly as possible eliminating, the cooling zone."

The prior Mayer machines (Exhibits 35 and 36) to which reference has herein been made, which were sold in February, 1907, to the Pen Carbon Manifold Company, of which Mr. Archbald was president, and were afterwards rebuilt by him, were carbon coating machines embodying therein steam heated equalizers. One of such machines applied coating to one side of the paper only, and the other to both sides. The supply and rewind rolls were located one above the other on the back end of the frame, and certain of the rolls were connected to hot or cold water pipes. Exhibit 35 contains practically all the elements of claim 47, but arranges them differently than does complainant. After the paper leaves the equalizer in the earlier machine it travels about two feet before reaching the chilling or annealing roll, as opposed to five inches in the patent in suit. The gist of the Mayer invention, as already pointed out, was the assembling of the coating roll, equalizer, and finishing or smoothing roll so closely together as to eliminate as far as possible the exposure of the paper to the atmosphere, after coating, and before chilling or annealing. Defendants' Exhibit 38 shows an idler interposed between the dope roll and the equalizer, which the experts on both sides agree would affect the physical condition of the paper before it reached the equalizer. Therefore the earlier Mayer patents are not anticipatory of the patent in suit, and the claims in controversy are not readable thereon.

The prior Stull machine (Defendants' Exhibit 57) built by the patentee herein, is claimed by defendants to be a complete anticipation; but complainant contends that it was never in fact completed and was incapable of producing a marketable product. In such machine the dope roll, adjustable equalizer, and smoothing roll were assembled close together to eliminate the cold zone, and hot and cold piping connections were provided. The rewind roll with friction drive mechanism was located above the supply roll at the back part of the machine frame, as in the patent in suit. The distinguishing features, however, were the employment of two equalizers between the coating and smoothing rolls, instead of one as in the patent in suit, and the interposition between the dope roll and the equalizer of an idler roll, which the defendant contends is similar to idler 7 in its machine, being used to keep the paper in contact with the dope roll when engaged in adjusting the equalizers.

There was much testimony regarding the transfer of such machine to Stull by a bill of sale in the autumn of 1908, about three years before the application for the patent in suit was filed. Complainant contended that the bill of sale did not constitute either prior public use or disclosure of the invention within two years before the filing

of the application, as the bill of sale was merely security for a debt, which subsequently culminated in delivery of the machine for non-payment on April 15, 1910. The machine is shown to have remained in complainant's factory continuously from 1908 until the date of delivery, where no one except Mr. Stull and employés were permitted to inspect it. Work of one kind or another was constantly being done upon it; for instance, the equalizers and drill rolls were changed several times, as in operation they caused the paper to vibrate, thus impairing its quality. Later on, one scraper was abandoned, the machine redesigned, various rolls located in different positions, the inlets and outlets for steam and water placed on the same side, the frame changed, and the idler roll abandoned.

[4] The sale of the product of the machine did not take the machine out of the experimental stage. Penn Electrical & Mfg. Co. v. Conroy, 159 Fed. 943, 87 C. C. A. 149. The witness Albrecht testified that defects were constantly occurring in the machine, and that it was generally understood by all, including Stull, that the carbon paper in question was produced by an incomplete machine, the use of which was still secret. The defendants have not sustained the burden of proving prior public use beyond a reasonable doubt. The Barbed Wire Patent, 143 U. S. 275, 12 Sup. Ct. 443, 36 L. Ed. 154.

[5] Complainant claims that the defendant Coakley, who had been in his employ, engaged his services as sales agent to the defendants A. & H. G. Mutschler in 1911, and from then on assisted them in the production of a fac simile of his coating machine. The evidence, however, is insufficient to sustain this claim. Coakley testified that he had no knowledge or information as to the exact character of the defendants' machine during its construction, that he made no suggestions of any kind as to the design, and, indeed, that he believed it would be a noninfringing machine of the kind previously sold by defendants to the Federal Carbon & Ribbon Company. Importance is attached to certain letters in evidence passing between him and one Bentley, a prospective purchaser; but such letters do not disclose an intention on the part of Coakley to sell a machine possessing the characteristics of complainant's and for these reasons the bill as to him should be dismissed.

The next question is whether the remaining defendants have appropriated in their coating machine the elements in combination of the various claims in controversy. Defendants contend that claims 1 to 4, inclusive, 7, 8, 14, and 15, embodying the feature of a releveling or smoothing roll arranged for receiving the paper directly from the equalizer, are entitled to only a narrow construction, and that as defendants in their machine utilize an idler roll between the equalizer and the smoothing roll "for bearing the arc of contact of the paper on the dope roll," infringement is thereby avoided. While it is true that immediacy and directness of travel of the paper are of the essence of the invention, still, as heretofore indicated, the claims should be construed in the light of what the patentee intended to accomplish, i. e., the passage of the paper directly from the coating roll to the equalizer and then to the smoothing roll, thus "traveling the minimum

distance before coming in contact with, or being contacted by, any other object which would have a physical effect upon the coat as it is applied." As defendants' smoothing roller 7 bears only slightly on the back of the paper traveling at the rate of about two feet per second, such bearing is a negligible factor, functioning more particularly to align the paper. It certainly does not in its position appreciably delay the progress of the paper and thus affect the temperature of the coating, and even though the paper is apt to get out of alignment when the scraper is upwardly adjusted, infringement of said claims in my judgment is not avoided. The exhibit drawing of defendants' machine shows the embodiment of a coating roll, equalizer, and smoothing roll closely assembled as in complainant's patent, the smoothing roll being hollow and capable of rotation, and designed, no doubt, for containing a heating or cooling fluid.

It is unnecessary to further detail the features of the many claims in controversy, or to point out specific or equivalent similarities in defendants' machine. I have referred to the broad claims, and have said that in my opinion they are appropriated by defendants in their construction, and upon comparing the more specific claims with it, it will be perceived that all the elements of the claims in combination, their method of arrangement, not only as to directness and immediacy of the travel of the paper, but as to the hot and cold piping connections of the finishing roll, the adjustable equalizer, the feeding and tensioning means, including the friction held roll from which the paper starts, the ironing device, the power-driven rolls, and friction windup roll located at the end of the machine, are all contained in defendants' structure, and are used in combination with the principal elements of the patent in suit. Claims 47, 48, and 49 are obviously not to be considered as containing independent elements or features, as their novelty resides wholly in their constituent adaptations with the primary invention to which they are limited, and, thus limited, they are not anticipated by the patents to Pembroke and Pulsifer.

Inasmuch as defendants' structure actually embodies the elements of the claims in controversy, or contains an embodiment of such a nature as will enable users easily to adapt the device to become an infringement of such claims, the defendants Mutschler and the Rochester Wax Paper Company must be deemed to infringe the same; and therefore a decree may be entered, except as to Coakley, holding the patent valid and the claims in controversy infringed, with two-thirds costs and disbursements.

## On Petition for Rehearing.

It was not intended to attribute to the Mayer patent more praise than the proof warranted. That the art was presented with the problem of how to improve the quality of carbon and wax paper without great waste in production, as "only about 25 per cent. of the coated paper produced by known coating machines was marketable," was perhaps an overstatement; but close analysis of the testimony of the witnesses Peterson and Marcellini nevertheless shows that the prior Republic-Dodge and Stull machines, which were largely dwelt upon by the de-

fense, and which were constructed by Mayer, were not wholly free from the objection due to the presence of a cold zone and retarded efficiency. The testimony of the witness Babcock, who made test sheets of coated paper on the Mayer machine in suit with various kinds of coating, would certainly indicate that a step in advance had been made in coating machines by which waste of both paper and dope was largely decreased. The expert witness Macomber testified that the Pulsifer and Pembroke patents showed coating machines of a different type from Mayer's machine, wherein a thinner coating of the dope proved efficacious.

2. It was not strictly correct to state in the prior opinion that the Lake British patent disclosed an idler interposed between the dope roll and the scraper. The specification says that "8 is the scraper for the underside of the paper strip after it passes from the first ink roller 5," "a guide roller 9 is provided for the strip after it leaves the first scrape or doctor 8," and "strip 8 passes from the inking mechanism, or mechanisms, over a drum D, which is made cold to harden the wax," thus indicating that the paper passes directly from the dope roll to the scraper and then to the idler 9; but the arrangement of the roll nevertheless was such that the efficiency of production of complainant's patent was not attained, as the paper had to travel through a cold zone.

3. The questions of the ownership of the Stull machine and of whether or not it was an experimental machine are sufficiently treated in the former opinion.

4. When it is considered that all the elements of claims 47, 48, and 49 were used in combination to complete the automatic operation of coating, unrolling, and then rolling up the paper, the claims, notwithstanding the presence of friction drives in the Pembroke, Pulsifer, and Republic-Dodge machines, are not for an aggregation. The question is not free from doubt, but as the various elements were all used together in combination, I think the doubt should be resolved in favor of the validity of said claims.

The petition for rehearing is denied.