## DAYTON ENGINEERING LABORATORIES CO. v. KENT.

(District Court, E. D. Pennsylvania.　August 27, 1919.)

No. 1757, Dec. Sess. 1917.

1. PATENTS ☞165—CLAIMS—CONSTRUCTION.
   Patent claims will be interpreted not only with regard to the inventive merit involved, but also in view of the contribution to the general welfare.

2. PATENTS ☞328—INFRINGEMENT.
   The Kettering patent, No. 1,223,180, for an improved automobile ignition system, *held* not infringed in so far as it provides for a device to save electrical current during "dwells" or stoppages of the engine.

3. PATENTS ☞185—CLAIMS—CONSTRUCTION.
   The doctrine that an inventor is entitled to all which he has accomplished, irrespective of whether he fully grasped the scientific principles involved, must be given a practical application, and, while it protects him against the use of equivalents, it does not give the exclusive right to subsequent devices suggested by the invention.

4. PATENTS ☞226—"INFRINGEMENT"—WHAT CONSTITUTES.
   To constitute patent infringement the mode of operation must be substantially the same; the results must be the same in kind, or the purpose and function must be substantially alike in use.
   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Infringement.]

5. PATENTS ☞226—USE OF INVENTIVE IDEA IN ANOTHER ART.
   There is no infringement in borrowing an inventive idea from one art and applying it in the construction of a device for use in another art.

6. PATENTS ☞328—AMENDMENT—NEW MATTER.
   Claims of the Kettering patent, No. 1,223,180, for an improved automobile ignition system by regulating the flow of electrical current *held* not invalid upon the ground that this feature was new matter introduced by amending the application without a supporting oath.

7. PATENTS ☞157(1)—CLAIMS—IRON COIL.
   In the Kettering patent, No. 1,223,180, for an improved automobile ignition system, the words "iron coil" in the claims have the special meaning given in the application.

8. PATENTS ☞328—VALIDITY—DISCLOSURE.
   The Kettering patent, No. 1,223,180 for an improved automobile ignition system, in so far as it provides for regulating the flow of electrical current, *held* invalid upon ground there is no sufficient disclosure of how the result is to be accomplished.

9. PATENTS ☞328—ANTICIPATION.
   The Kettering patent, No. 1,223,180, for an improved automobile ignition system, *held* anticipated.

In Equity.　Suit by the Dayton Engineering Laboratories Company against A. Atwater Kent, doing business as the Atwater Kent Manufacturing Company, involving patent No. 1,223,180, granted April 17, 1917, to Charles F. Kettering, for improvements in ignition systems. Decree dismissing bill.

Cyrus N. Anderson, of Philadelphia, Pa., and Kerr, Page, Cooper & Hayward, of New York City, for plaintiff.

Blount & Moulton and Cornelius D. Ehret, all of Philadelphia, Pa., for defendant.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

DICKINSON, District Judge. From the viewpoint of the plaintiff this case presents the very simple features of a need for an improved ignition system in automobile construction where the current supply is limited; the meeting of that need by the patentee through the contrivance of the device described in the patent application, and its commercial appreciation and acceptance as the supply of that need.

From the viewpoint of the defendants this hardship is felt. The defendants, in the effort which they were making to improve the ignition system which they were supplying, were given by the prior art the thought of introducing a nickel resistance coil, and made use of this as a feature of their improved system. This system had been designed without thought of plaintiff's system, and although it had been put in use for five years after application it was before the patentee's device had been patented or heard of by the defendants. The defendants' device, moreover, was designed and used in ignition systems in which the supply of current is not limited, but is renewed by means of an engine driven generator, and the resistance coil is not introduced for the purpose of stopping the flow of current, nor is a diminished current either desired or brought about in any real sense, as in plaintiff's device. The defendants in consequence protest against the upholding of any claims of the patent so broad as to forbid the use by others of "a tool of the art" as old and well known as "thermal resistance." The plaintiff, of course, repudiates any such claim, but, as the defendants obstruct the path of the patent claims only by the placement of a nickel coil, a finding of validity and infringement carries with it a denial of the right in any one, other than the patentee, to use a coil of any metal which acts as "a high temperature coefficient" resistant. The disclosures of the patent, it is further asserted, are so vague and indefinite, and the claims so broad and general, as to be no more than the statement of a need of the art, and a suggestion of the use of a known property possessed by some metals (named and unnamed) to achieve the desired result, with an invitation to the user to "cut and try" until he has hit upon a combination by which the wished-for result may be accomplished. The reward held out is the gratification of having made a contribution to the exclusive proprietary rights of the patentee, through which he may exact tribute from the users of what is thus found.

From the viewpoint of the public and of the promotion of the policy of the law the case presents, in one of its features, a good illustration of the need of the most thoughtful care in the application of the patent laws, and of the extent to which the finding of patent rights is influenced by considerations of the general good and the particular situation to which the claimed invention applies. The monopoly is not given, but is granted for a price, and there is the same duty not to grant without exacting the price as there is not to withhold the grant if the price has been paid.

The inventive genius who strikes out into a wholly new field of exploration, and brings back a new art, the practice of which is added to the activities of mankind, has acquired rights in what he has discovered which are universally recognized. He is really a creator,

and, if he gets all of what he has created, he has taken nothing from others except only the opportunity to be the like discoverers. Even here there are inequalities which are accepted because unavoidable. He may have happily stumbled upon his discovery or what he found may have been within the easy reach of any one, and yet his reward is as great as that of one who has discovered after years of laborious and painful search. This presents one situation. On the other hand, there is almost always room for improvement (or what is accepted as such) in the practice of any art, or in some of its instrumentalities or accessories. As the art becomes more and more highly developed, the room for improvement is contracted until it becomes true that the introduction of a slight advance costs more in time, effort, and its call upon the inventive faculty than the original invention exacted. It may be also true (and too often is) that a very small improvement in some instrumentality of the art, in the hands of powerful commercial interests, backed by a mastery of the psychology of advertising, if a legal monopoly be given of its use, may be used to dominate the whole art, and result in a monopoly of its whole product. From the standpoint of the inventor of such an accessory, he is as much entitled to all the fruits of his invention as is the creator of the art itself. There is, however, this great difference in the two cases. The grant of a monopoly to the one takes, as has been said, nothing from the public beyond the opportunity of making the same discovery. The grant of a monopoly to the other often takes from the public (in practical effect) the right to practice an established art, or compels the public to pay tribute, measured in amount only by the extent to which the owner of the accessory may be able to use it to dominate the whole art. The public is thus compelled by law to pay for the same invention over and over again, and the time limitation of the legal right to monopolize is defeated.

[1] This has led to the formulation of a doctrine of the patent law which is, in substance, that the claims of a patent application will be read not solely with an eye to the labor or inventive merit involved, but also with the value of its contribution to the general good in view, because this latter consideration is of the very essence of the spirit and purpose of the law. The patentee whose claims we are considering, like a modest, although famous, author, proclaims himself only "the improver of other men's stuff." He is not the creator of a new industry, but only of one of its adjuncts, and what he has done must be appraised with this thought in mind.

[2-5] In order to find a beginning to a line of thought which may lead to a comprehension of the legal principles involved in the present dispute, we begin with the statement that ignition systems in use in the automobile industry employ a firing spark and look to electricity to supply it. This in turn involves a current of electricity and means for closing and opening the circuit. In one system the source of supply is a stored battery. Contact points capable of being brought together and separated close and open the circuit. There is again involved two facts or conditions of operation. One is that the storage battery, although stored when the operation begins, has a limited

storage capacity; the other is that the supply is being exhausted during the time the contact points are together, and conserved when they are separated, and that further conservation is effected to the extent to which the flow of current is retarded during all conditions of operation. It is obvious that this latter saving must not be carried to the point of affecting the efficiency of the spark.

Before the advent of the patented improvement here involved objectionable, and what was believed to be avoidable, depletion of the current supply was experienced. Many minds were at work on the problem of finding a remedy for this undue waste and the inconveniencies which resulted. The contact points are brought together and separated in the engine operation. It might be that the stop was made when there was a juncture. The current would then continue to flow, resulting in pure waste. Remedies had been provided for this through a means for shutting off the current. Some had dependence upon the interposition of informed human effort. If through ignorance or neglect the switch was not thrown and the stoppage was prolonged, the battery was depleted. Others eliminated this undependable human element by means of automatically mechanically operating the cut-out. One now to be had makes use of this principle of thermal resistance to put in operation the mechanism which works the cut-out. The patentee took up this same task of providing a device which would supplant, or at least supplement, the human agency by furnishing a substitute when and if needed. The task was complicated (as the task of those who bring innovations into an established industry always is) by the practical necessity of catering to the preferences, and perhaps the prejudices, of those in the business, and the real need of making as few changes as possible in the established order of things. The patentee claims to have solved the problem by taking advantage through making use of a property or quality which certain metals possess. The property is that when cold they will (relatively well) permit the flow of current through them; when and as they rise in temperature they will (relatively well) retard and prevent such flow. Having a conception of the thought of making use of this property, the next part of the problem was how to do it. There is always some resistance to the flow. This resistance spells friction, and the friction heat, and with the heat comes the higher temperature, which calls in a wire coil, if one is used, for the very conduct in the metal which is meant to be provoked. A wire coil of the selected metal is thus suggested to be introduced in the circuit, and the intended result is claimed to be accomplished. This stoppage of the engine with the contact points in contact is defined by the patentee as a "dwell." There is, of course, more or less of the same dwell whenever the points are in contact. The dwell is of appreciable length at slow speed, and is a miniature dwell even at the highest speed. As a consequence this remedial device is operative when the engine is working as well as when it is stopped. When the engine is stopped, the more effective the prevention of flow the better the device; when the car is in motion, the remedy against waste of current may be so effective as to defeat its main purpose by preventing or retarding

ignition, and thus stall the engine. There might in consequence be the same folly committed which is voiced in the proverbs which excessive parsimony has provoked. The car must run at whatever cost of current, and the saving during running conditions must not be so excessive as to hold back an ample supply of current. If the cost of this is a greater expenditure of current when the car is not running, this cost must be paid. This excess of current loss is not a waste, but a necessary expense to secure good and safe running conditions. This brings into the problem the need of proportioning the elements of construction; the balancing of what will produce sparks when needed, and what will save current when "fat" sparks are not needed, and (so far as is practicable) stop the flow when no sparks are needed; the introduction of what will answer the purposes of "ballast," and also brings into it what has been adverted to as the "cut and try" features of the disclosures of this claimed invention. This presents the substance of the inventive thought which has its physical embodiment essentially in the introduction of a "resistance coil of iron wire, nickel, or other metal having a normally low coefficient of resistance, but the resistance of which will be increased as the heat or temperature thereof increases."

It is doubtless true that this is nothing more than "making use of a well-known tool of the art." It is also true that the device makes no very great call upon the inventive faculty. The invention is admittedly open to the criticism that all its elements are old. The criticism is met by the stock rejoinder that the thing invented is none the less new. The essence of the invention is the use of this resistivity of certain metals. It is of no consequence that the patentee was not the first to discover that iron, nickel, and some other metals possess this property. He surely did not create it, and could not have monopolized its use had he been the first to discover and make it known. The simplicity of the embodied form of the idea does not touch the question. The conclusion cannot be resisted that, although the prior art was rich in the material out of which this improvement might have been made, it was not so made before Kettering unless Delano made it. The emphasis laid upon the Delano device, and the time, effort, and expense given to its production for the purposes of evidence, is persuasive of the fact that what was done was first done by Kettering or by Delano. The thought may seem now to have been within the easy reach of any one, but the fact that the need of such a device was felt, and that this device has received commercial appreciation, argues its advancement upon the prior art. This much must be conceded to the plaintiff on legal principles which reason deduces, and which the cases cited in plaintiff's brief confirm. Westinghouse v. Dayton (C. C.) 106 Fed. 729; Miehle v. Whitlock, 223 Fed. 647, 139 C. C. A. 201; Æolian Co. v. Cunningham (D. C.) 251 Fed. 301.

Viewing the patented device as one limited in function and field of operation wholly to conditions of "dwell," we are met with a branch of the defense which makes inquiry into its patentable merits of no avail because the defendant's device is averred not to infringe.

The practical, because commercial, value of plaintiff's device is confined to those systems in which the supply of current is limited at its source. Its whole purpose, and the reason for its existence, is to conserve this supply by preventing the depletion of the storage battery through the waste of current. The defendant has no such infringing motive, because in its system the supply of current is not limited, and is not so constructed as to prevent a waste of current during "dwells." Defendant has reliance upon an engine driven generator to maintain a supply and a cut-out to shut off waste. The defendant in consequence neither aims nor desires to have its device do what the patentee is seeking to accomplish. The one is indeed the antithesis of the other. The patentee seeks to check the flow of current during slow-speed running conditions, and to shut it off during "dwells." The defendant seeks to have fat sparks at all times, and particularly during slow speeds and at starting. To accomplish this the flow of current increases as speed is reduced and is greatest during "dwells." Infringement, however, is not a matter of motive, but of fact, and plaintiff invokes the doctrine that partial utilization of an invention may constitute infringement just as much as if it was whole and complete; citing Sewall v. Jones, 91 U. S. at page 183, 23 L. Ed. 275; Penfield v. Chambers, 92 Fed. 630, 34 C. C. A. 579; King Ax Co. v. Hubbard, 97 Fed. 795, 38 C. C. A. 423.

The thought presented is somewhat akin to the one later discussed, that an inventor is entitled to all which he has accomplished, whether he has fully grasped the scientific principles which the invention has brought into operation or not, or even if he has not appreciated the full scope and extent of his accomplishment. The doctrine, however, must be given a practical application. It gives to the patentee whatever he has invented, disclosed, and claimed. It protects him against the use of equivalents. It does not, however, give him the exclusive right to what others may invent, even if the stimulus of the second invention was supplied by the success of his own, or even if his own invention suggested the effort which resulted in the second.

To constitute infringement of one device by the use of another, so far as the mode of operation is a factor the one must be such as to substantially embody the other; so far as results are a factor, they must be the same in kind, however they may differ in degree; so far as purpose and function, the application of the principle of construction, are factors, there must be substantial likeness in use. The patent laws do not deal with mere abstractions, but with things. There is no infringement in borrowing an inventive idea from one art and applying it in the construction of a device for use in another art. Use may be made of the same thought, and practically the same use may be made of it, but if the things the exclusive right to make, use, and vend which is granted to the first user are not the same as those made by the second user no conflict of rights arises. The test is not merely whether two things made are built on the same principle, but whether as things they are competitors. If we grant to this patentee the right to take from the common fund of knowledge this property of resistivity, and make use of it in the construction of an ignition

system for automobiles which will of itself serve as a cut-out of current during dwells, and reward him by a patent upon his device, we are not prevented from giving to the defendant the right to make full use of this same property of metals in the construction of another and in kind different device. The action of the metal coil is necessarily the same, but it does not follow that the devices are alike. This patentee proposed to himself to meet the need felt for a better device than those then in use. So far as the prevention of waste of current during dwells (which we are now considering) entered into the problem, the devices in use reduced the loss to practically nothing. His device must preserve this saving. The defect in the old devices was that they (for reasons already stated) were not always put in operation. His device was always in operation, and its results equally beneficial. The claim of merit made in his application that "the flow of current through the circuit is practically reduced to a negligible quantity" must, in view of the problem before him, mean that there was no appreciable loss of current.

Loss of current is of course unavoidable. Just what saving a test of the plaintiff's device would show we are not informed. We have on the one hand the claim of the patentee of what his device will accomplish, and on the other the result of the use of the defendant's device. A test of defendant's device shows a prolongation of the supply of current of from 31 hours 21 minutes to 39 hours 15 minutes. This saving indicates a utilization, as is argued, of some of the advantage which flows from the use of the patented device. This does not, however, prove infringement. The two systems have, it is true, this saving, to the extent indicated, in common, but they are not competitors, nor is the defendant's system a substitute for that of the plaintiff. They have no substantial identity in purpose of accomplishment, and their likeness is more formal than real. To hold that one is an infringement of the other would make it necessary to hold that the defendant could not make use of a "tool of the art" for one purpose because the plaintiff had first made use of it for another purpose, or to hold that a system designed and used for one purpose could not be used because it has something in common with another system designed and used for another purpose. The right given by the law is a monopoly of use and sale, and if there is no trespass upon this field there is no infringement. One practical test is that of commercial rivalry, and no one in search of a system to do what the plaintiff's was designed to do (we are still speaking of the cutting off of the flow of current during "dwells") would think of making use of defendant's. Our finding is, with respect to this branch of the case, against infringement, and this renders it unnecessary to make any finding of validity.

The merits of this invention, however, are asserted to be, and the claims of the patent cover, more than a device to save current during dwells. There is the further thought of so proportioning the parts which enter into the construction of the wire circuit that the flow of current will be regulated during running conditions. It is objected that this merit feature of plaintiff's system is an afterthought, not

260 F.—13

claimed in the original application, and was suggested by the defendant's system, or has been framed to lay ground for the claim of infringement. We do not deem this objection to be well founded. The claim is in the application without the amendment, and, even if it were not, the patentee is entitled to all which he has accomplished, whether he has set forth, or, indeed, appreciated, all the utilities of his invention. He is not required to set forth nor to comprehend the scientific principles which operate to bring about the results accomplished, nor, indeed, to know all which he has accomplished. If he has builded better than he knew, all which he has created belongs to him. Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U. S. 428, 31 Sup. Ct. 444, 55 L. Ed. 527; Roberts v. Ryer, 91 U. S. 150, 23 L. Ed. 267.

[6] Nor are we in accord with the view advanced by the defendant that the claims of the patent which embrace this feature are of no validity because this feature was interpolated by amendment of the application and is new matter introduced without a supporting oath. We have already found, in effect, that this feature is not new matter, and with this finding the supporting oath is present. Leonard v. Maxwell, 252 Fed. 584, 164 C. C. A. 500, presents the principle of the doctrine invoked.

[7] Nor do we think the defendant can escape the charge of infringement because of the fact that its resistance coil is made of nickel and not of iron. In those claims in which the words "iron coil" or their equivalents are used the word iron has the special meaning attached to it by the definition given in the application.

[8] With respect to the objection that there is no disclosure of how a system can be constructed which will serve the purposes of the thought of regulating the current during running conditions beyond the suggestion of employing this principle of resistivity, it may be said that the objection is as applicable to a system for preventing waste of current during dwells. There is, however, a very substantial and practical difference. The disclosures are directed to those skilled in the art. The thought of the introduction of a coil made of a metal having the stated property is admittedly definite, and the direction to so proportion the parts of the construction that this property will not be called into use during the limited time of point contact during running conditions, and yet will evince its presence during a prolonged dwell, is as definite a direction as can be given, and can be followed as readily as directions to a mechanic to make a construction consisting of two parts, which are to be securely fastened to each other. The purpose for which the construction is to be used being stated, and the strain known or readily to be determined, there is no requirement that the number or size of the nails or other fasteners used to hold the parts together should be set forth. The thought of using a given kind of metal is a thought of value, but plaintiff has no monopoly of the use of this thought until it is incorporated with a physical construction, and then he has not a monopoly of the thought, but of the thing constructed. It may, of course, be said with truth that the plaintiff has such a construction, and the two dwells vary only in length, and

that the reduction to a negligible quantity is the same in each case, what is a negligible quantity being wholly relative; but if this is said, the answer is at hand that the defendant's construction is entirely different in its purpose and in substance in its result. We do not draw the inference which the plaintiff draws of the use and purpose of the presence of a resistance coil of iron or nickel, and that there is a difference in kind, and not merely in degree, between the operation of this and the copper wire of the other parts of the circuit, from the fact that the latter is insulated and the former not. Without following the discussion into which the experts have gone, and which, although highly technical, they have made very interesting, we content ourselves with a statement of the conclusion reached that the disclosures of the application and claims in the respect of running conditions are no more than the suggestion of the thought that certain results can be accomplished by the introduction of a resistance coil made of iron or nickel, but that beyond this thought there is no disclosure of how the result is to be accomplished, but this is left for the prospective user to discover. This brings the claimed invention, within the principle on which were ruled the cases denying patentability, to the mere statement of a problem, and the suggestion of a thought which offers the promise of a solution. Re Incandescent Lamp Patent, 159 U. S. 465, 16 Sup. Ct. 75, 40 L. Ed. 221.

[9] The conclusions already reached and stated take away from the Delano device all importance, but, as otherwise it is of controlling importance, we will make the fact findings for which the future of this litigation may call. The right given by the patent laws involves several fact features, any one of which may affect the claim of right and which should not be confused. There may be real invention in the sense of originality, and yet no patentable invention, because the law gives the patent, not to the inventor, but to the first inventor. The granting or withholding of the patent rests upon the ita lex scripta est doctrine, but the reason the law was so written is that, in case two persons have independently made the same invention, a patent cannot be granted to the second person because it belongs to the first inventor. The other conditions of the grant including prior knowledge or use by others, public use or sale, description in patents or publications, involve the thought of a like denial of novelty, but the law is so written from motives of policy. A fair presumption arises that the applicant has not invented what has been made the subject of public description, and he cannot have been the first inventor of what was in prior use, and, aside from this, an inventor should not be permitted to withhold his claim to a monopoly until the value of his invention has been tested by public use or sale, because if he then gets a monopoly he gets not merely what he has invented, but he gets also an established trade, built up by the enterprise of others. To grant the exclusive right to what has been for a long time in commercial or other public use is an injustice to others who have been thus invited to embark in what is an open trade, even although the applicant has invented what is thus in use. He may well, therefore, be required to file his claim within a limited time, and not be per-

mitted to recall what he has once dedicated to the public. If Delano made the invention now claimed for him, Kettering's ignition system lacks novelty. If the Bishop car was equipped with such a system, there must be a finding of prior use. Brush v. Condit, 132 U. S. 39, 10 Sup. Ct. 1, 33 L. Ed. 251; Macbeth v. General Electric (D. C.) 231 Fed. 183; Mayer v. Mutschler (D. C.) 237 Fed. 657.

We are not impressed by the stress laid upon the injunction of secrecy imposed by Delano upon those to whom he disclosed his invention. If the question were one of dedication by Delano to the public, the kind of use made by him of his invention would have a meaning. The question, however, is wholly different, as it is the one of whether Kettering was first with his invention. The argument addressed to us with the purpose of throwing doubt upon the fact of invention by Delano is forceful, and if the question was whether the witnesses Bishop or Sellek had any appreciation (before this case arose) of what Delano had invented with respect to the features of importance now, the argument would be convincing. We can, however, not justify a finding which ignores what the "box of tricks" discloses. The thing which was made, with the testimony of the man who made it, is persuasive of what was made. We cannot doubt the introduction by Delano of a resistance coil in the ignition circuit, and that it was of iron, and answered to all the purposes of coil 29 in the patented system. It is true that in another litigation involving other issues, and in which the question before us did not arise, Delano and the other witnesses failed to mention, in the descriptions given of what Delano had done, features which are now of the utmost importance. Here, again, if the question were not what Delano had done, but whether there was any clear appreciation of the fact that he had done what Kettering afterwards accomplished, there would at least be such doubt as would deny a finding of anticipation. The very doctrine, however, which had our approval when invoked in Kettering's favor, that he was the inventor of what he had invented, whether he was alive to the full extent of its merits or not, applies as well to the Delano invention. It compels the conclusion that, if Delano contrived a system which was the same as that of Kettering, the latter was not the first inventor, although all which Delano had accomplished was not at the time appreciated. The use made of the Bishop system, and the length of time it was in use, and the changes of ownership through which it passed, forbid a finding that the Delano inventive thought was merely an inchoate undeveloped experiment, abandoned before completion.

Our conclusion is that defendant is entitled to a decree dismissing the bill of complaint for want of equity, and awarding costs, and a decree to this effect may be submitted.